Cahill et al. v. Eastman et al.

WILLIAM F. CAHILL, *et al.*

*vs.*

WILLIAM W. EASTMAN, *et al.*

The common right of each, is not to be injured in his property by the way in which another uses his.

Where it is sought to make one accountable for the consequences of acts done by him upon his own land, the question, in general, is not whether he exercised due care, but whether his acts caused the damage. If they necessarily tend to injure his neighbor in his pre-existing rights of property, he is liable in damages for the natural and necessary consequences thereof, irrespective of any considerations as to the care and skill with which such operations may have been conducted.

From and after January 8th, 1870, down to the time of the injuries for which plaintiffs seek to recover, they were the owners and in possession of a leasehold estate in certain mill property on the east bank of Hennepin Island. Hennepin Island divides the waters of the Mississippi at the Falls of St. Anthony, and above and below them, into two channels extending for about one thousand feet above and five hundred feet below. The bed of the river below is about thirty feet lower than the bed of the river above; a stratum of limestone about ten feet in thickness forms the bed of the river above the falls and extends across the island, and rests upon hard sand to the depth of the bed of the river below the falls.

Prior to October 4th, 1869, the defendants for their own purposes dug a tunnel six feet high from the lower end of Hennepin Island, and under the entire length of said island, and for a distance of three hundred feet under the bed of the river and mill-pond above the upper end of said island through the hard sand under said stratum of limestone, and at a depth of more than thirty feet below the level of the bed of the river above the falls. Just opposite the plaintiffs' mill it was dug within seventy-five feet of said east bank, which was a steep perpendicular bank down to the bed of the river below the falls, and as low as the bottom of the tunnel. On said 4th of October, the waters of the river burst into said tunnel at its upper end, and rushed through it in great volume, filling

Cahill et al. v. Eastman et. al.

it, and rending the rocks and tearing away the ground to a considerable extent on the top and sides for its entire length. Thereafter the flow of water through it was in most part stopped, but in April, 1870, during the ordinary spring freshet, the water again burst into said tunnel, filling it and rushing through it with such volume and force that it washed out and undermined the lower end of the island between the tunnel and the eastern shore on which plaintiffs' mill stood, from the mouth of the tunnel to plaintiffs' mill, and washed out and undermined land on which plaintiffs' had a right of way, and on which their mill stood, to the injury of plaintiffs' mill, warehouse and machinery. *Held*, that defendants were liable for such injury, without proof of negligence or unskillfulness on their part in the construction and maintenance of the tunnel until the time of the injury. Nor would the liability which they might incur by reason of their operations aforesaid be lessened by the fact that they did not own the soil in which the tunnel was dug. Nor would it be material for plaintiffs to show that defendants' possession and control of the tunnel continued down to the time of the injury. If they were responsible for the consequences of the excavation, they could not evade them by giving it up to others. It is also immaterial that after the water first broke in, the owners of the soil resumed possession and undertook to control and keep it out, and used such means therefor as temporarily to stop the flow of water, conducting themselves with such negligence, however, in the premises that in April the water again broke in and did the damage complained of.

A receipt dated January 4th, 1871, signed by plaintiffs' grantors, and entitled in an action in which said grantors were plaintiffs, and these defendants were defendants, purporting for value received to discharge defendants from all claims embraced within the purview of said action, and from all claims for damages on account of the tunnel constructed by defendants under Hennepin Island in said county, and agreeing that the action may be dismissed, is not evidence tending to prove an allegation in defendants' answer that said grantors brought an action against these defendants for the same identical cause of action, which being tried on its merits and a verdict returned for the plaintiffs therein, the defendants before this action was commenced paid the verdict and were discharged from said cause of action.

Appeal by defendants from an order of the district court for Hennepin county denying a motion for a new trial.

The case is fully stated in the opinion.

D. A. Secombe, and James Gilfillan, for Appellants, cited the following authorities: *Radcliff's Exrs. vs. Mayor, &c., of Brooklyn*, 4 *N. Y.* 195; *Schell vs. Second Nat. Bank, &c.,* 14 *Minn.* 43; *The Mayor of N. Y. vs. Bailey*, 2 *Denio*, 443; *Livingstone vs. Adams et al.* 8 *Cow.* 175; *Clark vs. Foot*, 8 *Johns.* 421; *Lasala vs. Holbrook*, 4 *Paige*, 169; *Thurston vs. Hancock*, 12 *Mass.* 220; *Panton vs. Holland*, 17 *Johns.* 92.


Lochren & McNair, for Respondents, cited the following authorities: *Williams vs. Groucott*, 4 *B. & S.* (111, *E. C. L.*) 149; *Bellinger vs. N. Y. C. R. R.,* 23 *N. Y.* 42; *Congreve vs. Smith*, 18 *N. Y.* 79; *Congreve vs. Morgan*, 18 *N.Y.* 84, *approved* 29 N. *Y.* 595; *Dygert vs. Schenck*, 23 *Wend.* 446; *Harrison vs. Gr. North. Ry.;* 3 *Hurl. & Colt.* 231; *Bagnall vs. London & N. W. Ry. Co.,* 7 *Hurl. & Norm.* 423, *affirmed in Exch. Cham.,* 1 *Hurl. & Colt.* 544; *Sutton vs. Clark*, 6 *Taunt.* 44; *Tuberville vs. Stamp*, 1 *Ld. Raym.* 264; *Tuberville vs. Stamp*, 1 *Salk.* 13; *Vaughan vs. Menlove*, 3 *Bing.* (*N. C.*) 468: *Hilton vs. Earl Granville*, 5 *Ad. & El.* (*N. S.*) 701; *Hays vs. Cohoes Co.*, 3 *Coms.* 159; *Gardner vs. Heartt*, 2 *Barb.* 165; *Gregory vs. Piper*, 9 *Barn. & Cress.* 591; *Fletcher vs. Rylands*, 1 *Law. Rep. Exch.* 265; *Rylands vs: Fletcher*, 3 *Law. Rep. Exch.* 352; *Shear. & Redf. on Neg.*, 373, § 327, *and notes and cases cited; Angell on Watercourses,* § 402; 1 *Hill. on Torts*, 572, § 16; *Wagner vs. Jermaine*, 3 *Den.* 306; *Plumer vs. Harper.* 3 *N. H.* 306; *Curtice vs. Thompson*, 19 *N. H.* 471; *Eastman vs. Amoskeag Co.*, 44 *N. H.* 143; *Smith vs. Elliott*, 9 *Barr.* 315.


*By the Court.*—RIPLEY, CH. J.—The plaintiffs claim as assignees of a lease dated June 28th 1854, from Franklin Steele to John Rollins and others of a certain water privilege and mill site situate on the east side of Hennepin Island below the Falls of St. Anthony, described as follows: " commencing one

Cahill et al. v. Eastman et al.

hundred and twenty-eight feet below an oak tree marked ' K,' opposite the brink of the falls on the east side of said island, and running thence eighty feet along the edge of the east bank of said island down the stream, and extending east into the stream from the east edge of said island sixty feet embracing a space sixty by eighty feet, as above described. The said Steele agrees to keep an open space sixty feet in width immediately adjoining, and in front of the premises above described, connecting with a public road or way leading to the bridge across the stream to the east bank    *    *    and to furnish sufficient quantity of water to run four run of stone in a grist mill to be erected on said premises by said lessees: . *  *  *  *   this lease to continue for the term of five years; *  *   each party shall choose one disinterested person, who, in case of disagreement, are hereby authorized to choose a third, who shall appraise the yearly value of the premises hereby leased for another period of five years, and the lessees shall have the privilege of holding the said premises for said additional term of five years, upon paying to the lessor such annual sum as the said appraisers shall name.  *  *  *  In case the lessees should elect not to pay such sum as may be found or specified by said appraisement, the value of the improvements made by the lessees shall be appraised in the manner above described, and the lessor shall pay the said value so appraised, which shall terminate this lease.

"At the expiration of ten years from the date thereof, the lease shall be continued or terminated in the same manner, and on the same terms and conditions, and so at the expiration of each period of five years, the value of the premises leased or of the improvements thereon, shall be appraised, and the lease continued or terminated another five years, as the lessees may elect."

" But at the end of twenty years, if said lease be not sooner

terminated, the lessor shall have the right to terminate the same upon paying the lessees or their representatives the value of the improvements upon the above premises, appraised in the manner above specified."

The lessees agreed " peaceably to surrender and deliver up possession of the said premises to said Steele, * * at the expiration of this lease, whether terminated at the election of the lessees as herein prescribed, or at the expiration of twenty years from the date hereof, upon the payment for the improvements made on said premises."

This lease having been continued till June 28th, 1869, appraisers chosen by the then parties in interest, assignees respectively of the lessor and lessees, on July 21st, 1869, appraised the yearly value of the premises for the ensuing five years. Said assignees of the lessees thereupon notified the assignee of the lessor that they would not accept said appraisal, and demanded an appraisement of the improvements, and appraisers were appointed, who, disagreeing, appointed a third; the three could not agree and ceased acting, making no award; the assignees of the lease remained in possession till December 3d, 1869, when they executed and delivered a deed to two of the plaintiffs, purporting to convey to them the said lease and leasehold estate, who went into possession, and on January 8th, 1870, executed and delivered a deed to the other plaintiff, purporting to convey one undivided third of said lease and leasehold estate, of which plaintiffs have since been in possession.

Upon this state of facts the defendants contend that the lease terminated on the 21st July, 1869, and that thereafter the lessees had only a claim against the lessor for the value of the then existing improvements. . We think, on the contrary, that the lease by its terms would not terminate till after payment by the lessor of the appraised value of the improvements.

Cahill et al. v. Eastman et al.

No such appraisement having been had the lease remained in force.

The plaintiffs were, then, on and after said 8th day of January, the owners and in possession of said lease and leasehold estate on Hennepin Island, which island divides the waters of the Mississippi River into two channels at the falls, and above and below them, extending for about one thousand feet above and five hundred feet below. The bed of the river below is about thirty feet lower than the bed of the river above; a stratum of limestone about ten feet in thickness forms the bed of the river above the falls and extends across the island, and rests upon hard sand to the depth of the bed of the river below the falls.

Prior to October 4th, 1869, the defendants dug a tunnel six feet high from the lower end of Hennepin Island, and under the entire length of said island, and for a distance of three hundred feet under the bed of the river and mill-pond above the upper end of said island through the hard sand under said stratum of limestone, and at a depth of more than thirty feet below the level of the bed of the river above the falls. Just opposite the plaintiffs' mill, it was dug within seventy-five feet of the east shore, which was a steep perpendicular bank down to the bed of the river below the falls, and as low as the bottom of the tunnel.

On said 4th October, the waters of the river burst into said tunnel at its upper end, and rushed through it in great volume, filling it, and rending the rocks and tearing away the ground to a considerable extent on the top and sides for its entire length. Thereafter the flow of water through it was in most part stopped, but in April, 1870, during the ordinary spring freshet, the water again burst into said tunnel, filling it and rushing through it with such volume and force that it washed out and undermined the lower end of the island be-

tween the tunnel and the eastern shore on which plaintiffs' mill stood, from the mouth of the tunnel to plaintiffs' mill, and washed out and undermined the land on which plaintiffs' had a right of way, and on which their mill stood, to the injury of plaintiffs' warehouse, mill and machinery.

The land through which the tunnel was dug belonged to the St. Anthony Falls Water Power Co., the assignee of Steele.

The case does not disclose the object of the work. The defendants, however, dug the tunnel for their own purposes, whatever those were, and nothing appearing to the contrary it must be taken, of course, that they did so with license of the owners of the soil.

That the defendants did not own the soil could not of course lessen the liability, if any, which they might, because of their operations therein, incur with respect to plaintiffs. If the owner could not have made the excavation with impunity, certainly one who was not the owner could not. On the other hand the owner might authorize another to do that which he could lawfully do himself. Nor would it be material for plaintiffs to show that the possession and control of the tunnel, which the defendants, in the nature of things, must have had while digging it, continued down to the time of the injury to plaintiffs. If they were responsible for the consequences of the excavation, they could not evade them by giving up such possession and control to others. *Eastman vs. Amoskeag Co.*, 44 *N. H.* 143.

In considering, therefore, what liability the defendants incurred towards plaintiffs, they will be spoken of as if they owned the soil in which the tunnel was dug.

The defendants contend that plaintiffs cannot recover, without proof of negligence or unskillfulness on the part of the defendants in the construction of the tunnel, and that they maintained it in that condition until the time of the injury;

and they take a position with respect to the facts, the correctness or otherwise of which is, as we think, material to the decision of the case.

It was not the tunnel, they say, but the water which did the mischief. They did not bring or collect this in the tunnel. It was collected in the river, and *burst* into the tunnel from some cause not shown, from the wrongful act of a stranger, from the act of plaintiffs, from *vis major* or the act of God. As this argument concedes, there is no proof, and in the absence of proof there is no presumption, that the breaking in of the water was due to either of the causes specified.

The complaint describes the excavation and alleges that it was done so negligently that the water burst in. The answer denies that the work was done negligently.

As the case discloses only the bare fact of the excavation of the tunnel, the strongest way in which this can be taken for defendants, is that the most careful and skillful person would have dug just such an one, believing it to be safe. If, nevertheless, the water *burst* in, this cannot be said to be the result of some cause *not shown*. The pleadings disclose the cause, viz.: the superior force of the water overcoming the resistance which the roof of the tunnel, as defendants had constructed it, opposed to it. Then it may be said with entire correctness, that the tunnel itself brought the water into it.

If the defendants had removed the whole of the river-bed at the upper end of the tunnel so as to allow the water to flow into it, no one would dispute but that the tunnel thus constructed was the cause of that effect. Where is the difference between that, and what actually happened, viz.: the flowing in of the water upon the removal of the river-bed to within a certain distance from the surface, leaving it insufficient to support the superincumbent stream. Certainly there is none on principle.

It is true that in the case supposed the defendants would have known that such a result must follow. In the case at bar they believed that they had left a barrier sufficient to keep out the water. This may take away *moral* blame from them, but it cannot effect their *legal* responsibility, if they are legally responsible. *Smith vs. Fletcher et al., Exchequer, June,* 1872.

But if the water by its own natural force will break through the barrier thus left to keep it out, into the tunnel, that would be just as much the direct and inevitable result of *such* an excavation, as of the surface excavation above supposed.

Once in, the tunnel guided the water to a point where it undermined and destroyed plaintiffs' property. The excavation of the tunnel necessarily tended to cause this injury. The property of the river, as of all running water, was to abrade and wear away that with which it came in contact; in this case, in the first instance, the top, sides, and bottom of the tunnel, whether earth, sand, or rock. On one side of the tunnel was the east bank of the island, where plaintiffs had these valuable rights of property. The force with which the river filled and rushed through the tunnel sufficed very quickly, in the operation of its natural quality aforesaid, to wear away and undermine the said east bank of the island in the place where plaintiffs' property was. But thus to set the river at work in that place, was to do that which necessarily tended to produce such a result. How soon the river would reach the plaintiffs, depended upon the intervening area of sand and rock to be washed away. It *must* reach the plaintiffs' property, eventually, unless its natural action was interfered with. The defendants, then, by thus digging this tunnel did an act which necessarily tended to injure the property of the plaintiffs.

Then the question is: Are the defendants liable without regard to considerations of care and skill ? They admit that they are, if the act complained of is such as must necessarily result

Cahill et al. v. Eastman et al.

in an interruption of some absolute right of plaintiffs, or some injury to them or their property.    Such, they say, is not this case ; but we cannot see why not.

We do not perceive the difference, in principle, between an act which must necessarily so result, and an act which necessarily tends to the same result.    The destruction of property of which the plaintiffs were in the lawful possession and use, being too, it may be remarked, as emphatic an interruption thereto as is conceivable.    *Hay vs. Cohoes Co.*, 2 *N. Y.* 159. *In Fletcher vs. Rylands*, 1 *Exch. L. R.* 265, the defendants had constructed a reservoir on their premises, and filled it with water, which flowed by an underground communication which defendants were ignorant of into plaintiff's mine.    They were held liable without proof of negligence for the damages necessarily sustained by plaintiff by such flow of water.    On appeal to the House of Lords, it was said by Lord Cranworth that, " in considering whether a defendant is liable for damages which the plaintiff may have sustained, the question, in general, is not whether the defendant has acted with due care, but whether his acts have occasioned the damage.    This is all well explained in the case of *Lambert vs. Bessey*, reported by Sir T. Raymond, and the doctrine is founded in good sense. For where one person in managing his own affairs causes, however innocently, damage to another, it is obviously only just that he should be the party to suffer.    He is bound *sic uti suo ut non laed at alienum*.    This is the principle of law applicable to cases like the present, and I do not discover in the authorities that were cited any thing conflicting with it."

In that case the defendants voluntarily brought the water to where it was dangerous to plaintiffs, though without any design to injure them, having no idea but that the reservoir would hold water.

In the present case the defendants had no idea but that the

roof of their tunnel would keep out water. The act which caused the mischief, however, was as voluntary on their part, as that of the defendants in *Fletcher vs. Ryland.* They brought water to a shaft that led to plaintiffs' property. These defendants brought a shaft that led to plaintiffs' premises, to the water.

A more recent case, that of *Smith vs. Fletcher* above cited, still more forcibly illustrates the truth of Lord Cranworth's observation, that the question in these cases is not whether a defendant has exercised due care, but whether his act has caused the damage, and presents, at the same time, features more closely analogous to those of the case before us. Plaintiff and defendants were lessees of adjoining mines, the level of the plaintiff's mine being below that of the defendants', so that water coming from defendants' mine by natural gravitation flowed therein by underground communication into plaintiff's mine.

A portion of the ore in defendants' mine came to the surface and was got by quarrying. This caused a large hollow of various depths. Part of the ore was got by mining beneath the place where such hollow had been made. The result of the defendants' operations was a hollow, to the lowest parts of which, water, if it got into the hollow, would flow, and which was not water tight. A flood came, a brook overflowed, and instead of the water passing over the surface and getting away as it should have done, it got into the hollow so made by the defendants, and of course could not escape except through the fissure, or cracks in the bottom, and did so escape into defendants' mine, and thence into plaintiff's. " How," asks Bramwell, B., " does this differ from *Fletcher vs. Rylands?*" The defendants here did not, indeed, make a reservoir. But suppose they had made the hollow, originally excavated for other purposes, into a reservoir, or fish pond, or ornamental

Cahill et al. v. Eastman et al.

water, would the fact that it was originally made for another purpose than holding water have made any difference ? That cannot be. But it is said they did not bring the water there as in *Fletcher vs. Rylands.* Nor did they in one sense ; but in another they did. They so dealt with the soil that if a flood came the water, instead of spreading itself over the surface and getting away innocuously to the proper water-courses, collected and stopped in the hollow, with no outlet but the fissures or cracks. Suppose the rain, without a flood, falling in this hollow had made, as it will, pools in the lower part, and the water so collected had gone through the fissures and cracks into the mine, instead of being left on the surface to evaporate and percolate naturally, and that the damage to the plaintiff had been sensible, could the defendants say they were not liable because they did not cause the rain to fall ? So, can they say, they did not cause this flood-water to collect where it did, with no outlet, except but to the mines, because it came there by the attraction of gravitation. It is said that the flood was extraordinary, and that they could not foresee it. I repeat my remark that that may take away *moral* blame from them, but how does it affect their *legal* responsibility ? If, for their own purposes, they had diverted this flood into the hollow where it came, though not knowing what would happen, it is clear that they would be liable. Why are they not, if it comes, because it must come, from natural causes ?"

In this case it was admitted that there was no personal negligence on the part of defendants, and evidence tendered by them to show that they had made due provision against any flooding from ordinary rainfall, was rejected as immaterial.

They were held liable because they had " artificially caused foreign water to get into plaintiff's mine—water which did not arise there, nor get there by merely natural means—water

which got there not by the defendants' not preventing it, but by their causing it."

So, in the case at bar, the defendants say, that they did not bring the water into the tunnel, as in *Fletcher vs. Rylands*, and the same answer may be made as above. They did not in one sense; but in another they did. They so dealt with the bed of the river that the water, instead of passing over it and getting away innocuously to the natural outlet, broke through it into the defendants' tunnel and thence into plaintiffs' property. Can they say that they did not cause the river to come where it did, into the tunnel, because it came there by reason of the insufficiency of the roof thereof to keep it out, following an irresistible natural tendency? The defendants' operations may as truly be said to have occasioned the damage to the plaintiffs, as those of the defendants in *Smith vs. Fletcher* to the plaintiff in that case.

We agree with the defendants that such a case as this comes rather under the head of nuisance. "As to nuisance to one's lands," says Blackstone [2 *Bl. Com. B.* 3. *ch.* 13. *p.* 218.] "if one erects a smelting house for lead so near the land of another, that the vapor and smoke kill his corn and grain, and damages his cattle therein this is held to be a nuisance. And *by consequence it follows,* that if one does *any other act, in itself lawful,* which yet being *done in that place necessarily tends to the damage of another's property, it is a nuisance ;* for it is *incumbent on him* to find some other place to do that act, where it will be less offensive." That is, it is his duty not to make such a use of his own property as will injure his neighbor's; the maxim, *sic utere tuo ut alienum non laedas,* applies, and he is liable, at all events, for the consequences, if he violates that duty.

What is called the *natural* right of support from neighboring soil, is also an illustration of this. The distance intervening

between an excavation and the place where the injury is caused, is not material so long as the excavation is clearly proved to have been the cause of the injury.   Nor is the defendant excused because he was making a lawful or even an ordinary and usual use of his land, what has been called a *natural* use of it.   [ *Per Lord Cairns in Ryland vs. Fletcher*, 3 *Exch. L. R. p.* 352,] viz.: taking out the minerals therein ; nor by his ignorance of the state of adjoining land, or of the position of strata which he *cannot* know, which may contribute to the injury.   *Bonomi vs. Backhouse, E. B. & E.* 622.   Respecting this right of support it is said by Bramwell, B., in *Rowbotham vs. Wilson*, 8 *E. & B.* 136, that " it is inaccurate to say, that the plaintiff is claiming any kind of easement, qualified or otherwise, an easement seeming to me to be something additional to the ordinary right of property ; the plaintiff is merely claiming the common right not to be injured in his property by the way in which another uses his. "   See also *Humphries vs Brogden*, 12 *Ad. & El.* ( *N. S.* ) 738-743, *per Lord Campbell.*

.   This common right has, as it seems to us, been violated in the case at bar.   The defendants put their land to a use which necessarily tended to injure the plaintiffs' pre-existing rights of property, and the damage the plaintiffs have sustained is the direct and immediate result of the defendants' operations aforesaid on their own land.   The plaintiffs had a right to hold their property free of such a result of the defendants' use of their land.

The defendants  cite *Smith vs. Kenrick,* 7 *C. B.* 564, as showing that they are not liable.   That case, however, was relied upon by the defendants, in both *Fletcher vs. Rylands*, and *Smith vs. Fletcher*, but the court in both cases held that it was not an authority for them.   Lord Cramworth, indeed, refers to it as an illustration of an injury *not* caused by the act of

the defendants. The owner of a coal mine on the higher level, worked out the whole of his coal, leaving no barrier between his mine, and the mine on the lower level, so that the water percolating through the upper mine flowed into the lower mine, and obstructed the owner in getting out the coal. This it may be said was the *necessary* result of defendant's act. Unless, however, such result is an injury to some pre-existing rights of the plaintiff, it is *damnum absque injuria*. *McGuire vs. Grant*, 1 *Dutcher*, 332; 12 *Mass.* 220.

The right of the defendant in *Smith vs. Kenrick* to take out all his coal, using due care, was as perfect as that of the plaintiff to take out all *his*. Since in that respect they stood upon an equality, the defendant was under no obligation to plaintiff to guard against the *natural* consequences of the exercise by *both* of that right, viz.: damage sustained by plaintiff by reason " of the natural flow or percolation of water from the upper strata."

But in *Williams vs. Groucott*, 4 *B. & S.* 195, it was held that one entitled to the minerals under the land of another with license to make a mine shaft opening into it, is, in the absence of any stipulation to the contrary, under a legal obligation to the owner of the surface soil to fence the shaft so as to prevent it from being a source of danger to cattle which may be upon it. " Looking," says Mr. Justice Blackburn, " to the general rule of law that a man is bound so to use his own property as not to injure his neighbor, it seems to me that where a party alters things from their normal condition *so as to render them dangerous to already acquired rights,* the law casts upon him the obligation of fencing the danger, in order that it shall not be injurious to those rights."

So in *Thurston vs. Hancock*, 12 *Mass.* 220, cited by defendants, where one built a house on the edge of his own land, and ten years after the owner of the next lot dug so deep into it

as to endanger the house, and the owner on that account left and took it down, it was held that while no action lay for the damage to the house, without proof of malice or negligence, it was otherwise with respect to the damage arising from the falling of plaintiff's natural soil into the pit. "The law," says Ch. J. Parker, "founded upon principles of reason and common utility, has admitted a qualification to the absolute dominion of the proprietor of land over it, restricting him so to use his own as not to injure the property, or impair any actual existing right of another." The house not being ancient, plaintiff had acquired as against defendant no right to have it in *that* place on his land, i. e., in a location necessarily trenching on defendant's right (as perfect as his) to use his property also to the best advantage. But as to the injury to the natural soil the court said: "A man in digging upon his own land is to have regard to the position of his neighbor's land, and the probable consequences to his neighbor, if he digs too near his line; and if he disturbs the natural state of the soil he shall answer in damages; but he is answerable *only* for the natural and necessary consequences of his act, and not for the value of a house put upon or near the line by his neighbor. For in so placing the house, the neighbor was in fault, and ought to have taken better care of his interest."

This amounts to saying that I cannot by improving my own land prevent my neighbor from afterwards improving his, though my neighbor's improvement will necessarily injure my improvement. Such damage is called in *Thurston vs. Hancock*, " adventitious," arising in that case, from the dangerous place in which the house was put. But if the necessary consequence of defendant's improvement is to injure plaintiff's land, the defendant is liable, at all events. The property of each in his own soil is absolute. As it is, so, as against every one, he has the right to have it remain. Therefore his neighbor cannot alter

that condition of things, though by an improvement of his own land ; for he thereby infringes upon an existing right.

It will be noticed that this decision in respect to *the house* has no application to the present case. The destruction of plaintiffs' mill, &c., was in no way due to any peculiarity of position upon plaintiffs' land. If they could in any case build upon their own premises and be protected in their improvements against the consequences of defendants' acts on *their* land, they could have done so here, for the mill stood *outside* the island, over the perpendicular bank thereof, and seventy-five feet from the tunnel. Nor was it the washing away of defendants' soil which caused the fall of plaintiffs' building, but of plaintiffs' own land. If the ravages of the water had stopped with the undermining of defendants' land, plaintiffs' improvements would not have suffered. We may add, while upon this point, that the rule appears to be, that if in any case the giving away of the soil would, as a matter of fact, have taken place to the same extent if the building had not been there, the damage to the improvements, as well as to the soil, are recoverable.

Thus, where the working of mines, in however careful a manner, has caused a subsidence of the adjacent land, the owner is entitled to recover in respect to buildings thereon, although not ancient, provided their weight did not contribute to the subsidence. *Stroyan vs. Knowles*, 6 *Hurlstone & Norman*, 454.

In *Hunt vs. Peake, Johnson* (*Eng.*) *Ch.* 705, *Wood, V. C.*, said " that the plaintiff had a clear right to build as he thought fit upon his land upon the assumption that sufficient support would be left to bear the burden of the soil itself."

So in *Brown vs. Robins*, 4 *Hurl. & Nor.* 186, it was held that as the sinking of the plaintiff's land was in no way caused by the weight of the house, he was entitled to recover for the injury to the house, whether it was ancient or not.

Cahill et al. v. Eastman et al.

It is true that in *Foley vs. Wyeth*, 2 *Allen*, 131, it is said that the unqualified rule that for any injury to his soil, resulting from the removal of the natural support to which it is entitled, by means of an excavation on an adjoining tract, the owner has an action against the party by whom the mischief was caused, is limited to injuries caused to the land itself, and does not afford relief for damages by the same means to artificial structures; and that for an injury to buildings unavoidably incident to the depression or slide of the soil on which they stand, caused by the excavation of a pit on adjoining land, an action can only be maintained where a want of due care and skill or positive negligence has contributed to it. The court cite *Brown vs. Robins* to another point, but make no distinction between buildings, the weight of which contributes to the slide, and those which do not so contribute. But it would seem that the latter proposition could not have been affirmed of the buildings in question in that case, so that it was not necessary for the court to advert to that distinction. For the same reason, perhaps, it did not advert to the settled distinction between buildings ancient, and not.

None of the other cases referred to by the defendants, in our judgment, conflict with the proposition that the maxim above quoted applies to the present case; and that the defendants are consequently liable for the damage sustained by plaintiffs, as for an injury to existing rights necessarily resulting from the operations of defendants upon their own land. *Panton vs. Holland*, 17 *John.* 92, *and La Sala vs. Holbrook*, 4 *Paige*, 169, were cases of injury to buildings by defendants excavating their own land so near to such buildings as to cause them to settle. What has been said as to *Thurston vs. Hancock*, is also applicable to these cases.

*Clark vs. Foot*, 8 *Johns.* 421, holds that one may set fire to his fallow, without liability for damage by the fire communi-

cating to his neighbor's property, unless negligence or misconduct is shown.

The plaintiffs, relying upon *Tuberville vs. Stamp*, 1 *Ld. Rayn's* 264; *Filliter vs. Shepard*, 12 *Q. B.* 347; *Canterbury vs. Atty. Gen.* 1 *Phill.* 306; insist that this was not the rule at common law, as to fires, but grew out of a change and exception in English statutes before the revolution. (6 *Arnne ch.* 31; 14, *Geo.* 3, *ch.* 78) We need not decide the point. It is enough to point out that the act of setting fire to one's fallow, where there is no negligence or misconduct, is not one which *necessarily tends* to the damage of another's property so that if not interfered with it *must* result in injury to him.

In *Livingston vs. Adams*, 8 *Cowen*, 175, the injury was not the direct and necessary result of the building of the dam. It resulted from no insufficiency of the dam, as such, but from a "leak produced in the bottom of the dam, most likely by the operation of the frost." The act of God, in fact, might be said to have caused it.

In *Bailey vs. Mayor*, 3 *Hill.* 531; 2 *Denio*, 433, the dam was built with an insufficient water way. It was not such an one as ought to have been constructed and maintained for the purpose, and for the safety of those whose property would probably be injured by the breaking of the dam. It was therefore held to have been negligently built. Ch. Walworth remarks that: "The degree of care and foresight, which it is necessary to use, in cases of this description, must always be in proportion to the nature and magnitude of the injury which will be likely to result from the occurrence which is to be anticipated and guarded against. And it should be that care and prudence which a discreet and cautious individual would or ought to use if the whole risk and loss were to be his own exclusively. Here the probable, if not the necessary, consequence of the carrying off of the city dam, by a flood, would

be not only to sweep away the buildings and erections of all the owners of property upon the Croton below such dam, but also to endanger the lives of such owners and their families. The dam should, therefore, have been constructed in such a manner as to resist such extraordinary floods as might have been reasonably expected occasionally to occur. And if the flood of 1841 was not *much* higher (the italics are ours) than any which had been known to occur upon this stream within the memory of man, those who had the charge of the construction of the dam should have anticipated such a flood; and should have provided a dam that would have been sufficient to resist the operation of that flood." The inquiry at once suggests itself as to what would be a flood *not much* higher than as above, and how far short such a definition of due care falls short of *successful* care, in a case in which *probable* consequences are to be guarded against.

In this connection we may refer again to *Hay vs. Cohoes Co.*, which seems to us to furnish an illustration of the maxim " *sic utere*," &c., which is in point here. The defendants in lawfully digging a canal on their own land found it necessary to blast rocks, and fragments were thrown against and injured plaintiff's building. "The defendants," say the court, "had the right to dig the canal. The plaintiff had the right to *undisturbed possession* of his property. If these rights conflict, the former must yield to the latter, as the more important of the two, since, upon grounds of public policy, it is better that one man should surrender a particular use of his land, than that another should be deprived of the beneficial use of his property altogether, which might be the consequences if the privilege of the former should be wholly unrestricted. * * * *

"The use of land by the proprietor is not therefore an absolute right, but qualified and limited by the higher right of others to the lawful possession of their property. To this possession

the law prohibits all *direct* injury, without regard to its extent or the motives of the aggressor.  *   *   *   *

"No one questions that the improvement contemplated by defendants on their own premises was proper and lawful. The means by which it was prosecuted were illegal notwithstanding. For they disturbed the rightful possession of the plaintiff and caused a direct and immediate injury to his property." It was held that defendants were liable, although no negligence or want of skill was alleged or proved.

We find it stated, however, in *Washburn on Easements, p.* 439, that though one by excavating within his own premises causes an injury to his neighbor's property, he would not be responsible therefor if he had no just cause for supposing such a consequence would follow, and it resulted from some unforseen cause.

We cannot accept this, however. The defendants in *Rylands vs. Fletcher* contended that every man has a right to use his land for all lawful purposes, and if he does so without knowledge that he will thereby occasion injury to another, he cannot be held responsible should injury occur, insisting that knowledge of possible mischief is of the very essence of the liability incurred by occasioning it. The House of Lords, however, repudiated any such theory.

Prof. Washburn cites *Turner vs. Chadwick,* 6 *Bing.* (*N. C.*) 1 ; and *Shrieve vs. Stokes,* 8 *B. Monroe,* 453. The first was relied on by defendants in *Fletcher vs. Rylands,* but it was answered that the plaintiff there was held to have no right to support his vault, from his neighbor's, and that the judgment proceeded on the ground of the absence of right to such support, and on the fact that no circumstances existed imposing on the defendants the duty of care ; and Lush, J., observed that the plaintiff in that case, in fact, sought to impose a servitude on the defendants, a remark which the case as reported warrant-

ed. *Shrieve vs. Stokes*, too, seems not to be an authority for the proposition it is cited to support, though it contains a *dictum* to the same purport.

We have not overlooked *Rockwood et al. vs. Wilson et al.*, 11 *Cush.* 22, (though not cited at the bar) which holds that nothing can be better settled than that if one do a lawful act on his own premises he cannot be held responsible for injuries that may result from it, unless it was so done as to constitute actionable negligence.

But it is to be noted that what *may* result, is not the same thing as what *must* result, from a given act. And as the court distinguishes between such an act as that of which it was speaking, and a private nuisance, which it terms an unlawful act, it may have had Blackstone's above quoted definition of such nuisance in mind. But if it intended the statement to apply to all cases of the necessary results of acts in themselves lawful, we think it is too broad. Nor do we consider that the cases it cites would sustain it in so holding. *Panton vs. Holland,* and *Thurston vs. Hancock*, have been noticed.

*Rees vs. Tourtellot,* 11 *Met.* 460, and *Bachelder vs. Hogan,* 6 *Shepley,* 32, like *Clark vs. Foot,* are cases of fire kindled on one's own land.

In *Boynton vs. Rees,* 9 *Pick.* 328, the defendant's duty to the plaintiff required him to keep his flume in repair, and it is held, that being bound to repair it he was not responsible for the accidental consequences of so doing, if he was not guilty of negligence.

In *Vincent vs. Howland,* 10 *Met.* 373, the plaintiff met with the accident by going out of the highway, and falling into a pit dug by defendant on his own land. Defendant was not bound to fence against the highway, and plaintiff had no right to be upon his land.

*Brown vs. Kendall,* 6 *Cushing,* 292, was also injury to the

person by defendant inadvertently wounding plaintiff in attempting to part their dogs which were fighting. Such an attempt was a lawful one, and the court held that, therefore, if the hitting the plaintiff was unintentional, and done in the exercise of all due care, proportioned to the exigency of the case, this was the result of pure accident, or involuntary and unavoidable, and, therefore, the action would not lie.

It is said by Mr. Justice Blackburn, in *Fletcher vs. Rylands*, that it is believed that all the cases, in which inevitable accident has been held an excuse for what *prima facie* was a trespass, can be explained on the principle that the circumstances were such as to show that the plaintiff had taken that risk on himself. This remark seems to be applicable to *Brown vs. Randall*. When the defendant, to separate the dogs, began to beat them, the plaintiff was looking on, at the distance of about a rod, and advanced a step or two towards the dogs, who in their struggle approached the place where the plaintiff was standing, the defendant retreating backwards before them, striking as he retreated. The plaintiff, therefore, voluntarily assumed a position in which the risk of collision with defendant was apparent. If he chose to keep it, it may well be said that he took that risk upon himself.

Before leaving this part of the case we may remark, that although the case of *Bagnald vs. London & N. W. Rwy.*, 7 *H. & N.* 423 ; *H. & C.* 544, has many of the features of the present case, we have not referred to it to support our decision, because in *Fletcher vs. Rylands*, in the exchequer chamber on appeal from the court of exchequer, two of the judges by whom Bagnald's case was decided stated the ground of the judgment in that court to have been, that however the water got upon the line, the company was bound by its charter to have its drains in order so as to carry off the water, and that its drains were not in order.

Cahill et al. v. Eastman et. al.

In the view we take of the present case, viz.: that the injury to the plaintiffs' property was the direct and necessary result of the defendants' operations, it is, obviously, entirely immaterial that after the water broke in in October, the Water Power Company assumed and undertook to control and keep it out, and used such means therefor as temporarily to stop the flow of water, conducting themselves with such negligence, however, in the premises, that in April the water again broke in and did the damage complained of.

It cannot lessen the liability of defendants for the result of their own acts, that another, a mere volunteer for aught that appears, had undertaken to prevent such result, but had failed, whether from carelessness or not. Such a defence really comes to this; that though the defendants stood aside and let the water take its course, they are not liable because a stranger might have stopped it if he had used the proper means. An analogous position would be, that I am not responsible for damage done by my cattle escaping into my neighbor's close, because a stranger who tried to keep them in might have done it if he had taken proper pains.

The defendants' position with respect to their liability is, that the true rule is that stated by Mr. Justice Bronson, [4. N. Y. 195,] that a man may use his own land for all the purposes to which such lands are usually applied without being answerable for consequences, provided he exercises proper care and skill to prevent any unnecessary injury to the adjoining landowner. This, in the sense which that learned judge himself understood it, has not been sustained in New York. Speaking of what has been quoted from *La Sala vs. Holbrook*, he says that he thinks, "the reasoning unsound—especially in reference to property in cities and large towns. If the doctrine were carried out to its legitimate consequences, it would often deprive men of the whole beneficial use of their property. An unimproved

lot in the city of Brooklyn would be worth little or nothing to the owner, unless he were allowed to dig in it for the purpose of building ; and if he may not dig because it will remove the natural support of his neighbor's soil, he has but a nominal right to his property, which can only be made good by negotiations and compact with his neighbor. A city could never be built under such a doctrine. I think the law has superceded the necessity for negotiation, by giving every man such a title to his own land that he may use it for all the purposes to which such lands are usually applied, without being answerable for consequences ; provided he exercise proper care and skill to prevent any unnecessary injury to the adjoining landowner."

This was disapproved in *Farrand vs. Marshall*, 21 *Barb.* 409, and it was there held, Mr. Justice Wright delivering a most learned opinion, that an owner of land has not a right by excavating upon his own land to remove the natural support which his land should afford to the land of an adjoining owner. (*See also Pixley vs. Clark et al.,* 35 *N. Y.* 520.)

The proposition, moreover, is readily seen to be too broad, if tested by the most common case of an ordinary use of land. If land be naturally fit for pasture, what is more common than to use it for that ? Yet by the common law every man is bound, at his peril, so to keep his cattle that they shall not escape and damage his neighbor's land. No use can be named to which it is more usual to put land than the construction and use of a privy. It is a necessary incident to habitancy in civilized communities. Yet, if the filth escapes, the owner is liable, irrespective of care and skill, for the consequences. He is bound, of common right, so to keep it in that it may not flow in upon and damnify his neighbor ; and the reason, says Lord Holt, why this is so is because every one must so

use his own as not to damnify another.    *Tenant vs. Goldwin*, 1 *Salkeld*, 21, 360.

Conceding, however, for the sake of the argument, that the true rule is as the defendants state it, the obvious corollary from it is, that if the excavation of the tunnel was an unusual and extraordinary use of the land, the defendants are liable for the consequences, irrespective of any considerations of care and skill.    This they concede by saying that whether the use was an extraordinary one or not, was a question of fact which should have been, but was not, left to the jury; for the character of the use would have been entirely immaterial, unless the liability of the defendants depended upon it.

In one sense it would be a question of fact, but one, nevertheless, which admitted of but one answer.    Such an excavation, on its face, was an unusual and extraordinary thing.    Its purpose not appearing, the jury as to that would have been left to conjecture.    Taking it, however, to have been the, thereby, making the river available for manufacturing, such an enterprise is, evidently, novel and unusual, as well as full of peril to defendants and adjoining properties in case of misadventure in its execution whereby the water should break in, whether from negligence, want of skill, or peculiarities in the strata of limestone in that place, impossible to be known beforehand.

We apprehend that the defendants themselves would not seriously urge that the case should be sent back to the jury, because the point whether this was, or not, an ordinary use of the land was not specifically left to them.    If not, this appeal seems to fail, upon their own statement of the law.

It only remains to notice the defence, that plaintiffs' grantors brought an action against these defendants for the same identical cause of action, which being tried on its merits, and a verdict returned for the plaintiffs therein, the defendants before

this action was commenced paid the verdict, and were discharged from said cause of action.

We do not see that any evidence was offered tending to sustain this allegation of the answer. The defendants merely offered a receipt, to the exclusion of which they except, dated January 4th, 1871, entitled in an action wherein said grantors were styled plaintiffs, and these defendants, the defendants; and whereby for value received said plaintiffs discharged the defendants from all claims embraced within the purview of the action, and from all claims for damages on account of the tunnel.

*This* action is for injuries done to the property since plaintiffs owned it, and there is no showing that plaintiffs' grantors ever had any right of action therefor. Nor was there any that the two actions were for the same cause of action. The receipt (the only evidence offered) does not state in respect of injuries to what property of the plaintiffs therein mentioned, the action was commenced. The point, however, was not made at the argument in this court, nor were the exceptions taken to the rulings at the trial as to certain items of damages urged here. Without going into a detailed discussion of them, therefore, it is enough to say that we see no errror in the rulings of the court below in these respects.

Order appealed from affirmed.