## STATE OF MINNESOTA *vs.* TIMOTHY BARRETT.

## January 28, 1889.

**Trial for Murder— Challenge of Juror—Actual Bias — Trial of Challenge—Discretion of Court.**—The defendant, upon trial for the crime of murder, challenged a juror, who was of the regular panel, on the ground of actual bias, claiming that in a conversation upon business matters with his (defendant's) mother, the juror had manifested the alleged bias. The mother was called, sworn, (Gen. St. 1878, *c.*116, § 28,) and testified to expressions of ill-will made by the juror, all of which he positively denied. It further appeared that the conversation was in the presence of the juror's clerk, whereupon defendant's counsel demanded that the court issue its process, and compel the attendance of the clerk, that he might be examined as a witness as to the juror's competency. *Held*, that under the circumstances of the case the court did not err in refusing to issue a subpœna, suspend proceedings, and secure the attendance of the clerk.

**Same—Juror of Foreign Birth—Proof of Declaration to become Citizen.**—When upon the *voir dire* of a proposed juror he states that he is of foreign birth and parentage, but, without objection, is also permitted to testify that he has declared his intention to become a citizen of the United States, the apparent disability is removed.

**Same—Certified Copy of Affidavit of Declaration.**—The original affidavit of such declaration, or a copy thereof, properly certified to by the clerk or deputy-clerk of a district court of this state, attested by its seal, is also competent evidence of the declaration of intention.

**Same—Clerk and Deputy—Appointment—Judicial Notice—Form of Signature.**—Judicial notice will be taken in a district court of the signature and official character of all persons who have been duly appointed deputies by the clerk, as all such appointments must be approved by the judge of the court. Nor, in proceedings in the same court, is it material whether a deputy of the clerk, when signing the jurat to an affidavit of intention to become a citizen, designates himself as a "deputy," or a "deputy-clerk."

**Same—Use of Seal of Court.**—The clerk is not one of the officers specially required by law to have and use a seal upon all occasions. The court itself has a seal, which must be used by the clerk as prescribed by statute.

**Same—Evidence of Naturalization.**—In collateral proceedings strict and technical rules should not be applied when determining whether or not the disability arising from alienage has been removed by proceedings under the naturalization laws.

**Same —Witness — Impeachment — Particular Facts — Material Facts —Contradictory Statements—Confessions.**—A witness may be discredited by evidence as to his reputation for truth and veracity, but specific and particular acts cannot be shown, except in some classes of cases, which need not be specified here. Foundation being properly laid therefor, a witness may be impeached by showing that he has elsewhere made statements upon some matter material to the issue, contradictory to those made upon the witness stand. If such statements are, in fact, confessions, the court should first pass upon their admissibility, precisely as if impeachment of the witness was not involved. If they are not confessions, the court should, as it did in this instance, charge the jury that statements not voluntarily made, or induced by fear or by the hope of an advantage held out to a witness, should be rejected, and not considered.

**Same—Possession of Pistol—Circumstances of Obtaining Possession —Instruction to Jury.**—The testimony tended to show that the bullet which killed the deceased was of the calibre known as "38." It was

therefore proper, and of some importance, to prove that the accused had a pistol of the same calibre in his possession upon the night of the homicide. The defendant denied possession of the weapon on the night in question, and also its ownership. He testified that it belonged to a brother, who was a witness for the prosecution. Thereupon the state introduced testimony in rebuttal, which tended to prove when and under what circumstances the accused first obtained possession of the revolver, a few weeks prior to the murder, and that it was while engaged in the commission of another felony. The object of this testimony, and the sole purpose for which it was received, was clearly and forcibly stated to the jury in the charge of the court. *Held*, that there was no error.

**Same—Capital Punishment—Discretion of Trial Court.**—Certifying to the existence of exceptional circumstances in a capital case, whereby the punishment is mitigated to imprisonment for life, is a matter peculiarly within the province of a trial court. The appellate tribunal should not interfere with its conclusions unless there has been a palpable abuse of discretion.

**Same—Newly-Discovered Evidence.**—Rulings in former cases, where the motion for a new trial has been made upon the ground of newly-discovered evidence, followed and applied.

The defendant was indicted with his brother Peter Barrett in the district court for Hennepin county for the murder of Thomas Tollefson on July 27, 1887, in the city of Minneapolis. Defendant, having demanded it, was allowed a separate trial, was tried before *Lochren, J.,* and a jury, was convicted of the crime of murder in the first degree, and was sentenced to be hanged. Defendant appeals from the judgment and from an order refusing a new trial. The circumstances of the killing, as shown by the testimony, are stated by the court in the next following case, *State* v. *Barrett, infra,* p 77 :

*W. W. Erwin, Wm. H. Donahue, John T. Byrnes,* and *C. Wellington,* for appellant.

*Moses E. Clapp,* Attorney General, *H. W. Childs, F. F. Davis,* and *Robert Jamison,* for the State.

COLLINS, J. The defendant, indicted for the crime of murder in the first degree, jointly with his brother Peter, having obtained a separate trial, was found guilty of the offence charged. From an order denying a new trial, and from the judgment, he appeals, alleging

numerous errors of the trial court in impanelling a jury, and in admitting and excluding testimony. He also avers error of the court in refusing to certify of record its opinion that by reason of exceptional circumstances the penalty of death should not be awarded, error in refusing a new trial on the ground of newly-discovered evidence, in its judgment inflicting the sentence of death by hanging, and error in other matters, to which we deem it unnecessary to make further allusion.

Upon the preliminary examination of a proposed juror—C. C. Wilson—he was challenged by the defence for actual bias. To establish this condition of mind, wholly denied by Wilson, the mother of the accused testified to the use of certain language in conversation with her upon a business matter, but in reference to defendant and his brother. It further appeared that whatever was said was in presence of Wilson's clerk, whereupon the counsel for defendant demanded the process of the court, whereby the clerk could be compelled to attend and testify to the conversation. The court did not err in refusing this demand, nor in submitting the merits of the challenge to the triers. It is statutory, (Gen. St. 1878, c. 116, § 28,) that witnesses may be examined on either side upon this preliminary question, and by the ordinary rules of evidence, but the defendant had no absolute or unqualified right to ask, under the circumstances here presented, that all proceedings should be brought to a halt, the compulsory process of the court issued, and the clerk produced as a witness. The juror was of the regular panel, of which the defendant undoubtedly took notice. The expressions of ill-will are alleged to have been made to the mother, and she must have known that the clerk was present at the time. Had the counsel made a natural and simple inquiry upon this point, they would have been advised that he was in a position to overhear all that was said between the mother and the juror. They should have been prepared to submit the material testimony bearing upon the juror's competency, and it was not an abuse of discretion for the court to refuse to issue its process and suspend proceedings, that the desired witness might be had. It follows that the court was justified in directing the triers to pass upon the merits of the challenge for actual bias.

It is next contended that, while impanelling the jury, the court ruled erroneously upon the qualifications of certain persons of foreign birth and parentage, thereby compelling the defendant to use five of the peremptory challenges guarantied him by statute upon men who, for the reason stated, were incompetent to sit as jurors in the case. It is the fact that when the last juror, William Powles, was called to the box, defendant had exhausted his right to challenge without showing cause; that five of these challenges had been used upon men who were disqualified, unless there was competent evidence of the declaration of each to become a citizen of the United States; and that Powles was also of foreign birth and parentage. The state submits the proposition, however, that upon the *voir dire* of these persons it was shown by proper testimony that each had in due form declared such intention in conformity to the various acts of congress commonly known as the "Naturalization Laws," and was therefore, by virtue of Gen. St. 1878, *c.* 71, § 3, and *c.* 107, § 3, a qualified juror. It is the admissibility and sufficiency of such portions of the evidence on this point as was received and held ample, despite the protests of defendant's counsel, and against the objections then presented, which we are now called upon to determine. Most of the objections interposed during the *voir dire* were common to each case. In some the fact that the proposed juror had declared his intention to become a citizen was first established by parol, (as had been the foreign birth and parentage,) no objection thereto being made in behalf of the defendant. This was clearly sufficient; but the state went further and produced, as it did with each man whose general qualification was questioned, the original declaration of intention, or a copy of the same, properly certified by a clerk or deputy-clerk, and attested by the seal of a district court of this state. The original declarations so offered and received were found, with many others, in books kept among the files and records of the clerk of the court in which this case was being tried, and known as the "Declaration Books." They were identified by the clerk as the books in which could be found the original affidavits made before him or his deputies, by such aliens as had appeared and declared their intention to become citizens. The objections made to these originals were that they were not records of

the court; that some were not attested by the clerk, but by persons who signed as deputies only, without the name of the clerk anywhere appearing; and that the seal of the court had been omitted from each. Section 2165, title 30, U. S. Rev. St. provides that an alien who wishes to become a citizen "shall declare on oath before     *     *     *     a court of record of any of the states having common-law jurisdiction, and a seal and clerk,     *     *     *     that it is his *bona fide* intention to become a citizen," etc.   By an amendment (subdivision 6 of the same section) this declaration may be made before the clerk of any such court, and in all cases it is the duty of the clerk to record the proceedings.   Gen. St. 1878, c. 8, § 259, authorizes the appointment by the clerk of one or more deputies, who are empowered to perform all the duties pertaining to the office.   These appointments must be approved in writing by the judge, and the appointees are then the officers of the court. How said deputies should designate themselves upon papers,—precisely what shall be their official appellation,—the statute nowhere states.   They act independently of the clerk, performing their duties personally; and we see no reason for holding that the deed should be described as that of the clerk, by his deputy.   It would be absurd, as well as untrue, to describe the act of the deputy in administering an oath as that of the clerk, by his deputy.

In the case of juror Bergquist, the deputy described himself as "clerk," instead of "deputy;" and in Powles' case the deputy, Dickey, signed the jurat merely as "deputy."   There was testimony, however, as to the official position of each on the days upon which they administered the oaths.   But the appointments of these persons as deputy-clerks must have been approved by the judge who presided at the trial, or by a judge of the same court, and in either event judicial notice might well be taken of the signature and official character of each.

The clerk of the district court is not one of the officers who are by law specially required to have a seal.   The court itself must have one; and in the attestation of papers, and upon all writs and process, the seal of the court, not that of the clerk, must be impressed.   Gen. St. 1878, c. 22, § 2, and c. 64, §§ 12, 13.

The declaration of intention is an important step towards a formal

judgment admitting an alien to full citizenship. Evidence of the declaration must be produced when final action is taken, and the judgment then rendered is of the same general validity as any other judgment of the same tribunal. The law requires the applicant to take the oath, and imposes upon the clerk the duty of properly certifying to the fact, and preserving a record thereof. As the applicant for citizenship has no supervision over the clerk, and cannot enforce obedience to the requirements of the law imposed upon that officer, it would be unjust to establish very strict or technical rules by which to determine, in a collateral proceeding, as this was, whether or not the disability arising from alienage has been removed. A record can be kept in no better manner than that adopted by the clerk who produced the books, and which is the customary method throughout the state. Blank declarations are bound in permanent book form, and used as occasion requires, until each blank is filled. This produces uniformity, neatness, convenience, and great safety. These originals are thus preserved in the best possible form, and are, as well as properly certified copies thereof, competent evidence of the recitals therein contained. *In re Coleman,* 15 Blatchf. 406. These remarks dispose of each of the alleged errors as to the selection of the jury.

Very few words are needed to dispose of the claim that the court should have permitted an answer to the question propounded the witness Henry Barrett, as to his attempt to kill his mother; and to Mary Coleman, relative to Henry's robbing his mother, and his threats in reference to her. The admitted object of such questions was: *First,* to attack the credibility of the witness; and, *second,* to show a motive upon his part for testifying for the prosecution, and against his brother. A witness may be discredited by evidence attacking his reputation for truth and veracity, and he is supposed to be constantly in readiness to repel an assault of this character; but specific or particular acts cannot be proved. *Rudsdill* v. *Slingerland,* 18 Minn. 342, (380;) *Moreland* v. *Lawrence,* 23 Minn. 84. It must be noticed, however, that we are not now dealing with acts which are really of the *res gestæ;* nor with threats which tend to indicate a hostile feeling towards a party against whom the witness is called, as was the case in *State* v. *Dee,* 14 Minn. 27, (35;) nor with an exceptional

case of the classes, or their kind, mentioned in *White* v. *Murtland*, 71 Ill. 250; *Ford* v. *Jones*, 62 Barb. 484; *Betts* v. *Lockwood*, 8 Conn. 487. In connection with the effort to prove the acts and threats just mentioned, an attempt was made by the defence to have the witness Mary Coleman state acts and declarations of Henry Barrett "which show or tend to show" that his hostility towards his mother was caused by her determination to disinherit him. The fact that Henry had manifested hostility towards his mother could not, of itself, affect his credibility as a witness in a case in which his brother was defendant. But the counsel intimate, without attempting to argue the point, that if his anger was caused by her decision to deprive him of a share of her estate, a motive is at hand for his very serious charge against a brother. The reasoning is too far-fetched for practical purposes. Henry's accusation would not tend to placate her, nor would it lead to an abandonment of her scheme, if she had one, to favor other children in a final disposition of her property. It is hardly necessary to suggest further that the question also called for the witness' opinion as to what particular acts and declarations possessed the tendency inquired about.

Although the evidence shows that one bullet passed through the thigh of the deceased, it is quite clear that his death was caused by the ball which was found in the body, and produced in court. This was of the calibre known as "38." It was therefore proper and of some importance to trace into defendant's possession a pistol of the same diameter of bore. On his direct examination, Henry Barrett had identified a revolver of "38" calibre as one owned and carried by the defendant on the night of the murder, and, if Henry's account be true, the one used by defendant when shooting Tollefson. This revolver, on which had been cut defendant's initials, "T. B.," was also recognized by the witness Truax, a policeman, who had taken it from defendant, when arresting him for some trivial offence, subsequent to the murder. The defendant denied the ownership, and testified that the weapon belonged to Henry. All testimony, therefore, which tended to fix the ownership or possession of this revolver in the defendant, became material, and was admissible in rebuttal. This was the purpose of the state in introducing the witness Cham-

berlin, who had been feloniously assaulted in the night-time, a few weeks before the murder, by two armed men. Chamberlin was also armed, but in the struggle had his revolver wrenched from his grasp by one of the would-be robbers, and carried away in the flight which promptly followed. He also lost his "Derby" hat. Immediate search revealed two revolvers and a "slouch" hat—neither the property of Chamberlin — lying upon the ground. The witness identified the revolver in evidence as the one taken by his assailant, and, with some degree of certainty, the defendant as the man who took it. With less positiveness Chamberlin asserted that Peter Barrett was the associate. It may be conceded that revolvers of this same make and calibre are quite common, that it is difficult for a person to positively distinguish one from another, and that Chamberlin had a limited opportunity to study the faces or voices of the men who attempted to rob him; but his testimony had some value and bear-. ing, precisely as if he had sold or given the weapon to a stranger, but could identify the person and article with the same degree of certainty. It is probably unfortunate for the defendant that this testimony, that of Minnie Barrett in reference to a change of hats made by him from one of the variety usually known as the "slouch" to a stiff "Derby," and the further testimony in regard to the loss, the recovery, and the sale of a horse about the time the assault was made upon Chamberlin, tended to connect defendant with that affair, but such fact is not sufficient reason for excluding the evidence. In this connection we may also allude to the charge of the court, in which particular and special attention was called to the only purpose for which this testimony was introduced or could be considered. The jurors were specially and carefully charged—if they found the revolver to have been taken from Chamberlin by defendant—to draw no inference prejudicial to him, to give the circumstance no more weight than if the testimony of the witness had disclosed a sale or a gift of the pistol to the defendant, instead of a felonious taking by him. It must also be held that the cross-examination of the defendant in regard to the revolver was pertinent and proper. The certified case states that he had, upon the direct, categorically denied the story of the murder, as previously detailed by Henry, which included

testimony connecting the defendant with this revolver, and its use by him when shooting the deceased. It also shows that upon the cross-examination, in answer to a question as to his being at a circus, he volunteered the statement that he had no revolver on the night of the murder, but that Henry had. By these denials and assertions he took issue upon vital points in the testimony of a witness for the prosecution, and invited a thorough and complete cross-examination.

Defendant's counsel insist upon treating all that part of his testimony, and that of his brother Peter, which was contradicted by the witness Jameson, as in the nature of evidence of confessions, and strenuously seek to apply the rules relating to the admission of confessions thereto. If the statements made to the officers were, in fact, confessions, the court ruled properly as to their admission; and, as will be seen later on, forcibly admonished the jury concerning their value as testimony. And if these statements made by Peter, when questioned as to his whereabouts on the night of the homicide and complicity therewith, could by any method be fashioned or transformed into a confession, there was but little testimony indicating that there was any positive promise of favor made, or that harm was threatened, or that an inducement was held out calculated to make the confession untrue. *State* v. *Staley*, 14 Minn. 75, (105.) The great preponderance of testimony was the other way; and, applying the rule contended for, the court made no mistake. But the statements were not confessions. Timothy and Peter, when questioned by the officers, who perhaps hoped to secure confessions of guilt, denied in the most emphatic manner all knowledge of the murder. Instead of acknowledging the transgression, they persistently affirmed their innocence.

It was claimed by the state that at various times the defendant and his brother Peter had made statements material to the case, contrary and at variance with those made upon the trial when under oath. Thereupon, first laying the foundation therefor, the state introduced evidence of the alleged contradictory statements, which, if believed, tended, under a most familiar rule, to impeach the witnesses, and injure their credibility. This was especially permissible

in the case of Peter, who, upon his direct examination, was minutely interrogated, and who, in response, gave a full account of the efforts made to secure a confession from him. The defence, by this course, invited his impeachment, if within the power of the prosecution, and should not have been surprised at a prompt refutation of the charges made by the codefendant. All of the circumstances surrounding the parties and the transaction were spread before the jury, and a most favorable charge of the court impressed upon them a duty to reject statements not voluntarily made by the witnesses, or such as were induced by fear, or by the hope of an advantage held out to them.

The death penalty is fixed by statute as punishment for the crime of murder, except in cases where the trial court shall certify that by reason of exceptional circumstances it should not be imposed, in which case the punishment shall be imprisonment for life. The court refused to certify to the existence of exceptional circumstances in the case at bar, and this refusal is alleged as error. This is a matter which is peculiarly within the province of the court before whom the accused has been tried. No appellate court should interfere with its conclusions, unless there has been a palpable abuse of the discretion which should be exercised upon so momentous an occasion. We can safely say that the importance of the question will invariably quicken the mind and conscience of the tribunal which must decide, and lead it to a just, a wise, and, in a meritorious and exceptive case, to a merciful determination. After a thorough examination of the testimony herein, we have no hesitation in saying that there is nothing which indicates that the learned judge, who felt impelled to refuse a certificate which would have made the sentence a much easier one to pronounce, omitted or neglected to carefully weigh and earnestly consider every circumstance, and all that could be said in extenuation by counsel for the convicted man.

The assignment of error numbered 26, by which it is urged that the statute granting power to and making it the duty of the governor to fix and designate by warrant the day of execution (Gen. St. 1878, *c.* 118, § 3,) has been repealed by the adoption of the Penal Code, was disposed of adversely to this contention, in *State* v. *Holong*, 38 Minn. 368, (37 N. W. Rep. 587.)

Upon the motion for a new trial herein, (which came on for argument after the trial and conviction of the codefendant, Peter Barrett,) there were used in support of the claim of newly-discovered evidence the affidavits of Julius C. Heyn and his wife, Gertrude, Adolph Heyn and his wife, Louisa, Patrick McLaughlin, Mary Story, and E. A. Mitchell. Each of these persons had testified for the defence on the trial of Peter, without affecting the result, and the court states in its order, when treating of this branch of the motion, that such fact largely affected its conclusion that upon this, as well as other grounds, the motion should be denied. In this view the court was fully justified, but could have easily stated additional reasons. One of the proposed witnesses,—Julius Heyn,—it appears from his affidavit, was at his house when the first shot was fired at Tollefson, and within 130 feet. He ran towards the scene, boarded the car after the team commenced to run with it, stopped them, and was the first person to learn that Tollefson had been killed. He went with the body of the deceased to police head-quarters, and as a witness appeared at the coroner's inquest. Had the defendant's counsel made any inquiry, or had they read the minutes of the inquest, this would have been discovered, and the testimony presented when it should have been. Each of the other persons making the affidavits, except McLaughlin, resided in the immediate vicinity of the scene of the tragedy, and, had the counsel exercised care and prudence, or diligently investigated the circumstances, all that the witnesses knew material to the issue could have been learned long before the trial.

The principal effort of counsel in the preparation and production of these affidavits seems to have been to establish that more than two shots were fired during the encounter. This, at best, would have been cumulative and unimportant, except that it might have had a tendency to contradict or discredit testimony given by other witnesses as to the number of shots. In either case it affords no ground for a new trial. Of the many cases upon these points, we cite *Knoblauch* v. *Kronschnabel,* 18 Minn. 272, (300;) *Fenno* v. *Chapin,* 27 Minn. 519, (8 N. W. Rep. 762;) *Peck* v. *Small,* 35 Minn. 465, (29 N. W. Rep. 69.) The affidavit of McLaughlin differs so much from his testimony, as given on the trial of Peter, as to excite suspicion and dis-

trust, even if its contents were of great materiality. In conclusion, upon this point, we may say that these affidavits were well met, and in the main disposed of, upon the argument of the motion, by the affidavits produced in behalf of the state. This, of itself, is sufficient, when we fully indorse the doctrine that on motions of this character much must be committed and permitted to rest in the sound discretion of the court below. *Mead* v. *Constans*, 5 Minn. 134, (171;) *Lampsen* v. *Brander*, 28 Minn. 526, (11 N. W. Rep. 94;) *Eldridge* v. *Minn. & St. Louis Ry. Co.*, 32 Minn. 253, (20 N. W. Rep. 151;) *Peck* v. *Small, supra.*

Having thoroughly examined the assignments, and found no error, the judgment and the order refusing a new trial are affirmed. The case is remanded for further proceedings.