# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03-1520

———————

| | | |
|---|---|---|
| Kennedy Building Associates, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Viacom, Inc., as successor in interest | * | District of Minnesota. |
| to CBS Corporation, as successor in | * | |
| interest to Westinghouse Electric | * | |
| Corporation, | * | |
| | * | |
| Defendant - Appellant. | * | |

———————

Submitted: December 15, 2003
Filed: July 15, 2004

———————

Before WOLLMAN, JOHN R. GIBSON, and RILEY, Circuit Judges.

———————

JOHN R. GIBSON, Circuit Judge.

Viacom, Inc., the corporate successor to Westinghouse Electric Corporation, appeals the judgment entered against it for damages and injunctive relief and the awards of attorneys' fees and prejudgment interest in this suit arising out of Westinghouse's environmental contamination of a site it once owned in Minneapolis. Kennedy Building Associates, the present owner of the contaminated property, obtained a jury verdict awarding it $225,000 in compensatory damages and $5,000,000 in punitive damages on its common law claim for strict liability. The

district court awarded Kennedy $106,393.23 in response costs Kennedy had already incurred under the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and the Minnesota Environmental Response and Liability Act (MERLA), and declared Viacom liable for any response costs Kennedy should incur in the future. The court also issued an injunction under the Minnesota Environmental Rights Act (MERA), requiring Viacom to clean up the contamination at the site. The court awarded Kennedy statutory attorneys' fees, witness fees, and costs in the amount of $1,113,915, and prejudgment interest in the amount of $41,677.89. Viacom appeals everything except the CERCLA and MERLA relief, arguing that the strict liability award was not permissible under Minnesota common law; that the strict liability claim cannot support an award of punitive damages; that the MERA claim is moot because Viacom has entered an administrative consent order concerning the contaminated property; that the attorneys' fee award was excessive; and that the prejudgment interest was excessive because Viacom had offered to settle the case. We reverse as to the common law strict liability claim and the punitive damages award; reverse and remand the award of injunctive relief with instructions to modify the injunction; remand for adjustment of the fees award; affirm the award of prejudgment interest on the CERCLA and MERLA claims; and reverse the prejudgment interest on the strict liability award.

Westinghouse owned the property at 2303 Kennedy Street in Minneapolis from the 1920s until 1980. Westinghouse used the building there to house an electrical transformer repair facility. A portion of Westinghouse's business there was the repair of transformers that were insulated with Inerteen, a Westinghouse product that contained polychlorinated biphenyls, known as PCBs. Chlorobenzenes were used as a solvent to thin the PCBs down to a usable consistency.

By the late 1960s, it was recognized that PCBs were potential carcinogens and that they were accumulating, rather than breaking down, in tissues and in the environment. In 1976, Congress passed the Toxic Substances Control Act, which

singled out PCBs as a hazardous substance, requiring the EPA to prescribe rules restricting their manufacture, use and disposal. Pub. L. No. 94-469, Title I, § 6, 90 Stat. 2020 (1976) (codified at 15 U.S.C. § 2605). In 1979, EPA banned rebuilding of transformers that contained PCB levels of more than 500 parts per million, stating that these operations presented an unreasonable risk of release of PCBs. Polychlorinated Biphenyls (PCBs), Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions, 44 Fed. Reg. 31514 (May 31, 1979) (codified at 40 C.F.R. pt. 671). PCBs and chlorobenzenes are classified as hazardous substances under MERLA and CERCLA. Minn. Stat. § 115B.02, subd. 8(1) (cross referencing 33 U.S.C. § 1321(b)(2)(A)); 42 U.S.C. § 9601(14) (same); 40 C.F.R. § 116.4 (listing hazardous substances). Sites contaminated with hazardous substances are subject to remediation under federal and state law. See 42 U.S.C. § 9604 (CERCLA); Minn. Stat. § 115B.04, subd. 1 (MERLA).

In 1971-73, Westinghouse undertook a study of the sites where it used PCBs. The purpose of the study was to ascertain whether PCBs were leaking from those sites and migrating off Westinghouse property, and if so, whether the PCBs were likely to be detected by others and traced back to Westinghouse. The head of the Westinghouse study, Dr. Thomas Munson, testified at trial that he examined four such facilities (but not the Minneapolis facility). Munson said, "We found PCBs everywhere we looked." Munson testified that Westinghouse stopped the study after the initial sampling of four plants showed PCBs were leaving the sites and showing up in wildlife (and fish markets) nearby. On cross examination, Viacom counsel brought out that the four plants sampled were manufacturing, not repair facilities, but Munson said that "it was a given" that repair sites were contaminated and that he told Westinghouse management,

> It simply wasn't possible to handle, ah, gallon quantities of PCBs, pumping them into transformers, draining them out of transformers, without having some spillage. And it was just a given at that time that

every facility that had been doing that for any length of time would have spilled considerable amounts of PCB.

(February 4, 2002, vol 4 p. 105-06.) The district court found,

Westinghouse knew during the time it owned the site at issue that there were health risks associated with PCBs, and that PCB contamination was virtually certain to be found at its long-term transformer-repair facilities.

(Order of May 31, 2002, slip op. at 3.) Viacom does not argue that this finding was clearly erroneous.

The district court found Westinghouse's operations contaminated the property with PCBs and chlorobenzenes through spillage, overflow of an oil-storage tank, and burning of PCB-contaminated oil in the building's furnace. Evidence at trial indicated that the site's soil was contaminated by PCB concentrations as high as 9,100 mg/kg (the allowable level is 1.2 mg/kg) and the groundwater contains concentrations as high as 37,000 µg/liter (the allowable level is .04 µg/liter). Expert witness William Welbes testified that the amount of PCB contamination now at the site indicates that approximately 18,000 pounds of PCBs have been spilled there, resulting in contamination of 25,000 tons of soil. Chlorobenzenes were also present in the groundwater. Welbes testified that, because the site was also contaminated with mineral oil, which is a solvent for the PCBs, the PCBs at the site are presently migrating and contaminating surrounding soil and groundwater of neighboring properties. The chlorobenzenes are very water soluble and they "show every indication of having left the site and they're still migrating."

The district court found that despite Westinghouse's knowledge that PCB contamination was "virtually certain" to exist on the property, Westinghouse sold the site to Hillcrest Development Company in 1980 without conducting any investigation

or decontamination at the site and without disclosing the nature of its work at the site. (Order of May 31, 2003, slip op. at 3.) Gerald Trooien, a partner in Kennedy Building Associates, bought the property from Hillcrest in 1982 and transferred it to Kennedy. The district court found that at the time Trooien bought the property, he did not know and had no reason to know that Westinghouse had disposed of hazardous substances at the site. (Id. at 4.)

In 1997 Kennedy entered negotiations to sell the property back to Hillcrest. In preparation for the purchase, Hillcrest hired an environmental consultant, who discovered the PCB contamination. Hillcrest withdrew its offer to purchase the site. Kennedy reported the contamination to the Minnesota Pollution Control Agency and entered the Agency's voluntary clean-up and investigation program, which required Kennedy to undertake field investigations of the contamination of the soil and groundwater in order to avoid being referred to the federal Superfund program. The Kennedy Building site was listed on the Minnesota Pollution Control Agency's permanent list of priorities on September 27, 2000.

In 1999 Kennedy filed this suit in state court seeking relief under MERLA and MERA, as well as under the common law of nuisance, negligence and strict liability. Viacom removed the case to federal court on grounds of diversity of citizenship, and Kennedy amended its complaint to add claims for CERCLA relief and punitive damages. Viacom filed a counterclaim asserting Kennedy was liable under CERCLA and MERLA, and seeking injunctive relief against Kennedy under MERA.

At the time of trial, Kennedy had incurred costs of $106,393.23 in investigating the contamination. The Minnesota Pollution Control Agency had required it to file a deed restriction showing the property was contaminated, which meant that Kennedy could not do anything that would disturb the soil on the property without obtaining Agency approval. The Agency issued Kennedy an assurance letter stating that Kennedy did not contaminate the site. Viacom and the Agency entered an

administrative consent order on the eve of trial, January 22, 2002, in which Viacom agreed to conduct a remedial investigation, submit a feasibility study, develop a response action plan, and implement such a plan.

The common law and punitive damages claims were submitted to a jury, which found in favor of Viacom on the negligence and nuisance claims, but which awarded $225,000 in actual damages and $5,000,000 in punitive damages on the strict liability claim. Because the CERCLA, MERLA, and MERA claims invoked the court's equitable jurisdiction, the district court decided those claims. The court found that Kennedy proved its CERCLA and MERLA claims against Viacom and that Viacom did not prove its CERCLA and MERLA claims against Kennedy. The court awarded Kennedy response costs of $106,393.23 for costs already incurred and declared Viacom liable for future response costs. The court held that Kennedy proved its MERA claim and accordingly the court enjoined Viacom "to remediate the site's soil, groundwater, and building interior so that the previously-placed deed restriction may be removed, pursuant to Minn. Stat. § 116B.07."

Kennedy filed post-trial motions seeking prejudgment interest and an award of attorneys' fees, expert witness's fees and costs. The motion was referred to a magistrate judge, who recommended the award of $41,677.89 in prejudgment interest on the CERCLA response costs and the actual damages award, and an award of $1,113,915 for attorneys' fees, expert witness's fees, and costs. The district court adopted the magistrate judge's recommendation and entered judgment accordingly.

I.

Viacom argues that the district court erred in interpreting Minnesota common law to hold a land-owner strictly liable to its successor in interest for contamination of land. The district court interpreted the common law tort derived from the English case of Rylands v. Fletcher, LR 3 H.L. 330 (1868), to provide a cause of action to

Kennedy against Viacom for the escape of PCBs and chlorobenzenes onto the soil and groundwater of the property. Viacom argues that the Rylands rule only creates a cause of action for land-owners against neighbors who cause harm by their use of nearby property. Viacom contends that Minnesota has not and would not extend the Rylands rule to create a cause of action in favor of a land-owner against its predecessor in title for harm done to the land when the predecessor owned it.

This Court reviews the district court's determinations of state law de novo. Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991). Our task is to ascertain how the Minnesota Supreme Court would answer the question before us; if no decision of that court directly addresses the question, we look at "related state court precedents, analogous decisions, considered dicta, and other reliable sources in an effort to determine what the Minnesota Supreme Court's decision would be." Union Pac. R.R. v. Reilly Indus., Inc., 215 F.3d 830, 840 (8th Cir. 2000).

In Rylands, the owners of a mill, Rylands and Horrocks, built a reservoir on land north of their mill, to supply their mill with water. The plaintiff, Fletcher, leased coal mines on a neighboring close of land between the reservoir and the mill. The water from the reservoir burst into old, disused shafts that communicated with Fletcher's mine and flooded the mine. Fletcher sued and prevailed in the Court of Exchequer Chamber, but Rylands and Horrocks appealed, arguing that because they did not know the shafts communicated with the mine, they were not negligent, and therefore they could not be liable. The House of Lords held that Fletcher did not have to prove negligence, since "the person who, for his own purposes, brings on his land and collects and keeps there anything likely to do mischief if it escapes, must keep it in at his peril." Id. at 339. Lord Cairns's opinion recited the lower court's statement of the ratio decedendi of the case expressly depending on the relationship of neighbor to neighbor:

[I]t seems but reasonable and just that the neighbour who has brought something on his own property (which was not naturally there), harmless to others so long as it is confined to his own property, but which he knows will be mischievous if it gets on his neighbour's, should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property.

Id. at 340.

"Minnesota was one of the first American jurisdictions to adopt the strict liability rule of [Rylands]," Minnesota Mining & Mfg. Co. v. Travelers Indem. Co., 457 N.W.2d 175, 183 (Minn. 1990), and was a leader in the development of the tort in this country, Jed Handelsman Shugerman, The Floodgates of Strict Liability: Bursting Reservoirs and the Adoption of Fletcher v. Rylands in the Gilded Age, 110 Yale L. J. 333, 348 (2000). Beginning with a case involving a tunnel collapse that flooded neighboring property in Cahill v. Eastman, 18 Minn. 324, 1872 WL 3309 (1872), Minnesota applied the theory in a wide variety of fact situations. See, e.g., Sachs v. Chiat, 162 N.W.2d 243, 246 (Minn. 1968) (pile driving damaged neighbor's house); Bridgeman-Russell Co. v. City of Duluth, 197 N.W. 971 (Minn. 1924) (water reservoir flooded neighbor's property); Wiltse v. City of Red Wing, 109 N.W. 114, 115 (Minn. 1906) (water reservoir flooded neighbor's house); Hannem v. Pence, 41 N.W. 657, 658 (Minn. 1889) (ice fell on plaintiff from defendant's unsafely designed building). In particular, Minnesota applied the theory to pollution and ground water contamination. Minnesota Mining & Mfg. Co., 457 N.W.2d at 183; Berger v. Minneapolis Gaslight Co., 62 N.W. 336 (Minn. 1895) (petroleum contaminated neighbors' property). The Minnesota Supreme Court summarized the rule as follows:

[A] party who, for his own profit, keeps on his premises anything not naturally belonging there, the natural tendency of which is to become a nuisance, and to do mischief if it escapes, is liable if it escapes, without proof of negligence, for all damages directly resulting therefrom.

Wiltse, 109 N.W. at 115 (emphasis in original).

The Minnesota Supreme Court has never entertained the question of whether the Rylands rule applies to the case of a land-owner suing its predecessor in title for damage to the land antedating the plaintiff's ownership of the land.

Kennedy does not claim that Minnesota has yet made the leap from liability to neighbors to liability to successors in title, but instead argues that Minnesota courts would do so, relying on T&E Indus. v. Safety Light Corp., 587 A.2d 1249, 1255-59 (N.J. 1991), in which the New Jersey Supreme Court extended Rylands liability to the claim of a land-owner against its predecessor in title for contaminating the land. Accord Hanlin Group, Inc. v. Int'l Minerals & Chem. Corp., 759 F. Supp. 925, 934 (D. Me. 1990); see also Interstate Power Co. v. Kansas City Power & Light Co., 909 F. Supp. 1224, 1240 (N. D. Iowa 1991) (denying summary judgment on strict liability claim brought by land-owner against predecessor in title for polluting land, but without discussing issue of whether strict liability should be extended to successors in title). The majority of courts that have considered this question have agreed that strict liability should not be extended to cover claims by a subsequent owner of the land against an earlier owner. Rosenblatt v. Exxon Co., 642 A.2d 180, 185-88 (Md. 1994); Hicks v. Humble Oil & Refining Co., 970 S.W.2d 90, 97 (Tex. Civ. App. 1998); Hydro-Mfg., Inc. v. Kayser-Roth Corp., 640 A.2d 950, 958 (R.I. 1994); Futura Realty v. Lone Star Bldg. Ctrs., 578 So. 2d 363, 365 (Fla. Dist. Ct. App. 1991); Andritz Sprout Bauer, Inc. v. Beazer East Inc., 174 F.R.D. 609, 623-26 (M.D. Pa. 1997); Cross Oil Co. v. Phillips Petroleum Co., 944 F. Supp. 787, 789-90 (E.D. Mo. 1996); 325-343 E. 56th St. Corp. v. Mobil Oil Corp., 906 F. Supp. 669, 677-78 (D.D.C. 1995); Dartron Corp. v. Uniroyal Chem. Co., 893 F. Supp. 730, 740 (N.D. Ohio. 1995); 55 Motor Ave. Co v. Liberty Indus. Finishing Corp., 885 F. Supp. 410, 423 (E.D.N.Y. 1994); Wellesley Hills Realty Trust v. Mobil Oil Corp., 747 F. Supp. 93, 101-02 (D. Mass. 1990) (buyer knew of contamination at time of land sale); see also City of Minneapolis v. Arkla, Inc., No. 4-91-CV-44, 1993 WL 61827, at * 2 (D. Minn. 1993) (unpublished) (Under Minnesota law, claim for strict liability for ultrahazardous activities is "available only to adjoining or neighboring landowners.").

We must determine what the principle would be for limiting or extending Rylands liability and ascertain whether the Minnesota Supreme Court would accept or reject such a principle.

Viacom contends that the strict liability rule was "developed to protect the owner of property adjacent to a site from which a harmful release occurs." Minnesota has not limited the Rylands cause of action to cases in which the plaintiff and defendant were neighboring land-owners. The Minnesota Supreme Court once applied the doctrine in favor of a plaintiff who was not a land-owner, but was merely walking by the defendant's unsafely designed building when ice fell from the building onto the public sidewalk. Hannem v. Pence, 41 N.W. 657 (Minn. 1889). Furthermore, in Cahill the Minnesota Supreme Court applied the rule to a defendant that did not own the land on which it created a hazard. 1872 WL 3309, at *5 ("That the defendants did not own the soil could not of course lessen the liability, if any, which they might, because of their operations therein, incur with respect to plaintiffs. If the owner could not have made the excavation with impunity, certainly one who was not the owner could not."). Moreover, it made no difference that the defendant was no longer in possession or control of the instrumentality that caused the hazard. Id. "If [the defendants] were responsible for the consequences of the excavation, they could not evade them by giving up such possession and control to others." But cf. Mahowald v. Minnesota Gas Co., 344 N.W.2d 856, 860 (Minn. 1984) ("close examination" of Minnesota strict liability cases, including Cahill, shows that in each the instrumentality that caused damage was in "exclusive control" of the person sought to be charged.).

Viacom contends that the rationale for the Rylands rule is that a land-owner cannot protect itself from the activities of neighboring land-owners, and that such a rule should not apply to a successor land-owner because it could have avoided the harm by inspecting the property before it bought it. This reasoning finds support in case law from other jurisdictions, but is questionable in Minnesota. One of the leading cases on this issue concluded that a key ingredient of Rylands was the

neighboring land-owner's inability to protect himself from his neighbor's dangerous activities; accordingly, the court held that a land-owner who purchased the property after the harm was done could have avoided encountering the harm and therefore could not recover under Rylands.

> Subsequent users . . . are able to avoid the harm completely by inspecting the property prior to purchasing or leasing it. Thus, it is not unreasonable to expect subsequent users to bear the risk of such harm. We think, however, that it would be unreasonable to hold the prior user liable to remote purchasers or lessees of commercial property who fail to inspect adequately before taking possession of the property.

Rosenblatt v. Exxon Co., 642 A.2d 180, 188 (Md. 1994).[1] Accord 325-43 E. 56th St., 906 F. Supp. at 677-78. However, this rationale would also defeat a Rylands cause of action by plaintiffs who bought a property after neighbors had created a hazard, at least where the hazard was obvious. See Rosenblatt, 642 A.2d at 186 (strict liability limited to claims by occupier of land harmed by actions abnormally dangerous in relation to area, when carried on by "contemporaneous occupier" of neighboring land). Kennedy contends that this reasoning is inconsistent with the Minnesota Supreme Court's decision in Cahill. There, the Minnesota Supreme Court adopted the Rylands rule in a case in which defendants' tortious act was complete before the plaintiffs obtained an interest in the land. The defendants, Eastman et al., constructed a tunnel on the land of the St. Anthony Falls Water Power Co., the "assignee" of plaintiff's landlord, Steele. 1872 WL 3309, at *4. The tunnel was built before October 4, 1869, and the plaintiffs leased the mill on adjoining property shortly afterwards, in December 1869 and January 1870, respectively. Id. at *4-5. River

---

[1]We cite Rosenblatt with caution because it is clear that Maryland law is more restrictive of the strict liability tort than Minnesota law. Maryland has declined to extend strict liability to a case in which the defendant was a contractor that did not own the land on which it created a hazard. Rosenblatt, 642 A.2d at 187. Minnesota applied the Rylands doctrine to a contractor, rather than land-owner, in the first case in which it adopted the doctrine. Cahill, 1872 WL 3309, at *5.

water burst into the tunnel, causing erosion the length of the tunnel on October 4, 1869, before the plaintiffs became lessees. After the plaintiffs leased the mill, the tunnel flooded again in April 1870, this time eroding the land on which the mill stood. Id. at *5. Since the Cahill plaintiffs entered the leasehold after the tunnel had been built and one flood had happened, Kennedy contends that it was not fatal to the plaintiff's case that they acquired the property after the defendant created the hazardous condition or even after the hazard had manifested itself. The Minnesota Supreme Court did not inquire into whether the plaintiffs could have discovered the hazard by inspecting the property before entering into it. Minnesota law would thus not appear to restrict the Rylands cause of action to plaintiffs in possession of property at the time the defendant created the hazard, and it is questionable whether a neighbor's claim would be defeated by a showing that he could have learned of the hazard before acquiring the property. (However, the Cahill plaintiffs were in possession of the land at the time of the flood that eroded their mill; thus, they were not merely purchasers of land that had already suffered the damage for which they sued.)

Furthermore, a rule restricting Rylands liability on the ground that subsequent purchasers can inform themselves of the condition of the property would not fit a case such as this one, where the district court found that a visual inspection of the property did not reveal the contamination and that Kennedy "did not know, and had no reason to know, when [it] purchased the site, that Westinghouse had disposed of hazardous substances at the site."

We do, however, conclude that there is a principle that precludes a Rylands cause of action by a subsequent owner of the affected land. Minnesota's version of the Rylands rule has required that there be an "escape" of the instrumentality causing the harm. In Berger, the Minnesota Supreme Court summed up the rule:

> The essential condition of liability, without proof of negligence on the
> part of the owner, for injury to others by the escape of things kept by

> him on his own premises, is that the natural tendency of the things kept is to become a nuisance or to do mischief, if they escape. <u>The authority of Cahill v. Eastman is not to be extended beyond the class of cases possessing all of the elements upon which the judgment of the court was based.</u>

62 N.W. at 338 (emphasis added). With this admonition in mind, we may not extend the <u>Rylands</u> rule to a case in which the harm was not caused by an escape. Kennedy argues that the release of the PCBs and chlorobenzenes was an escape, and that it is not necessary for the escape to cross a property line. However, in <u>Hannem v. Pence</u>, the case in which the ice fell from the defendant's building onto the plaintiff, who was walking on the public sidewalk, the Minnesota Supreme Court characterized the tort as one in which the defendant in effect spreads his dominion past his own property:

> His [the defendant's] act was an attempt to extend his right as proprietor beyond the limits of his own property, at the expense of the safety of the traveling public. He was bound at his peril to keep the ice and snow that collects on his own roof within his own limits, and if the shape of his roof is such as necessarily or naturally to throw it upon the street, he is responsible for all damages, precisely as if he had under the same circumstances thrown it upon the premises of an adjacent owner.

41 N.W. at 659. This reasoning simply does not apply to a suit based on harm done to the defendant's own property. Kennedy rightly points out that not all courts limit strict liability to cases involving an escape. <u>See</u> <u>Wellesley Hills</u>, 747 F. Supp. at 102 ("Of course, as the rule developed, courts applied it to situations which did not involve an 'escape' from the land."). This view is reflected in Restatement (Second) § 519. However, the Minnesota Supreme Court has emphatically not adopted Restatement (Second) § 519, <u>see</u> <u>Mahowald</u>, 344 N.W.2d at 860-61, but has adhered to its own interpretation of the <u>Rylands</u> rule. Kennedy further argues that there was evidence that the PCBs did migrate across the property line. Be this as it may, Kennedy's suit was to recover for the damage to the 2303 Kennedy Street property, not for damage caused by the escape of the pollutants onto other people's property.

For instance, Kennedy's complaint alleged: "Defendant is strictly liable for the damages resulting as a natural consequence from the release of PCBs and related hazardous substances <u>on the Property</u>. . . ." (emphasis added). We conclude that this case does not fit the pattern of <u>Rylands</u> liability under Minnesota law.

Therefore, we must reverse the district court's entry of judgment for Kennedy on the jury's verdict of strict liability and accompanying punitive damages.

II.

Viacom next contends that the injunction entered under MERA, Minn. Stat. § 116B.03, is moot because Viacom has entered a consent order with the Minnesota Pollution Control Agency, in which Viacom agreed to conduct a remedial investigation, submit a feasibility study, develop a response action plan, and implement such a plan.

The administrative consent order does not state substantive standards for the remediation of the site. Instead, it requires Viacom to design and implement a remedial plan whose terms are yet unknown. The operative language of the consent order requires Viacom to

> Perform the following response actions in accordance with the terms and conditions of this Order:
> 1. Prepare a Remedial Investigation Work Plan (RI Work Plan);
> 2. Conduct the Remedial Investigation (RI) in accordance therewith;
> 3. Submit a Remedial Investigation Report (RI Report);
> 4. Conduct a Feasibility Study (FS);
> 5. Submit a Feasibility Study Report (FS Report);
> 6. Develop a Response Action Plan (RAP); and

> 7. Implement the Response Action Plan, including any operation and maintenance of remedial action systems, monitoring, and institutional controls. . . .

The substance of the clean-up will eventually be determined by negotiation between Viacom and the Agency, with remedies in case negotiations break down. Viacom is to submit to the Agency the various studies and plans called for in the order. The Agency is to approve the documents or propose revisions, to which Viacom then must respond. If the parties do not come to agreement, the Agency can do the work itself and sue Viacom. In the resulting lawsuit, the issues would be limited to the question of whether the Agency's clean-up was "reasonable and necessary to protect the public health and welfare and the environment."

The district court found that Viacom had not yet fulfilled the obligations imposed on it in the consent order. The court found that because "the site's soil and groundwater PCB concentrations exceeded the [Agency's] acceptable limits, [Kennedy] was required to place a deed restriction on the property. The restriction notifies potential purchasers of the contamination and restricts the owner's use and development options while the contamination remains." The court granted "judgment in favor of [Kennedy] and against Viacom, and affirmatively enjoins Viacom to remediate the site's soil, groundwater, and building interior so that the previously-placed deed restriction may be removed, pursuant to Minn. Stat. § 116B.07."

Viacom argues that the administrative consent order is entitled to some sort of preemptive effect because the Agency is a party to it. We must consult MERA itself to determine whether it gives the consent order a preemptive effect. MERA allows the state attorney general to intervene in MERA litigation pursued by others, Minn. Stat. Ann. § 116B.03, subd. 3, but it does not appear from the statute that the attorney general replaces the existing plaintiff or alters the plaintiff's standing to pursue declaratory or equitable relief in the name of the state. The Attorney General has not chosen to intervene in this case. This is a critical difference between the procedures

provided by MERA and those provided by the Clean Water Act, upon which Viacom relies in citing Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc., 138 F.3d 351 (8th Cir. 1998). Under the federal Clean Water Act, various statutory provisions provide that citizen suits are barred or preempted by agency action; in Comfort Lake these statutory provisions led us to conclude that a citizen suit had no substantive claim for civil penalties once such penalties had been recovered by the state in administrative proceedings. Comfort Lake, 138 F.3d at 356-57. Viacom points to no such provisions in MERA.

Viacom contends that, in light of the administrative consent agreement, MERA relief is precluded by Minn. Stat. § 116B.03 subd. 1, which states, "[N]o action shall be allowable under this section for conduct taken by a person pursuant to any environmental quality standard, limitation, rule, order, license, stipulation agreement or permit issued by the pollution control agency, department of natural resources, department of health or department of agriculture." Kennedy obviously did not sue for any action taken pursuant to the consent agreement since the consent agreement was not signed until the eve of trial and, even then, contained no substantive terms other than agreements to study and arrive at actual clean-up measures in the future.

The preemptive scope of section 116B.03, subd. 1, appears to depend on whether the injunction directly contradicts the Agency stipulation or can co-exist with the stipulation. In Williams Pipeline Co. v. Soo Line R.R., 597 N.W.2d 340 (Minn. Ct. App. 1999), the Minnesota Court of Appeals rejected a similar argument that an Agency consent order preempted a MERA claim. Williams owned a pipeline transporting petroleum products through a Superfund site. It entered a consent order with the Minnesota Pollution Control Agency and EPA to remove the pipeline from the site, but the consent order did not specify where the replacement pipeline should be placed, although Williams could only reroute within the site if EPA and the Minnesota Pollution Control Agency approved. Id. at 342-43. Williams proposed to reroute its pipeline under a railroad yard owned by MT Properties and sought an

-16-

easement by condemnation. Id. at 343. MP brought a MERA claim to enjoin the rerouting. The trial court found that rerouting the pipeline in the railroad yard would lead to shifting, mixing, spreading and dispersion of the existing contamination, id. at 345, but concluded that the MERA claim was barred by Minn. Stat. § 116B.03, subd. 1 because the claim challenged an action taken pursuant to the Minnesota Pollution Control Agency and EPA consent order. Id. at 343.[2] The Court of Appeals reversed, holding:

> Because the consent order allows Williams to choose among several alternatives, its decision to seek this particular easement and rerouting does not constitute an action taken "pursuant to" an order or stipulation of the [Minnesota Pollution Control Agency], and section 116B.03 is inapplicable.

Id. at 346. Thus, a consent order that specifies general but not particular actions a defendant must take to clean up a site does not preempt a MERA claim based on aspects of the defendant's actions that were not required by the consent order. On the other hand, MERA does not authorize an injunction that imposes standards conflicting with substantive standards affirmatively imposed by the Minnesota Pollution Control Agency or one of the other agencies named in section 116B.03, subd. 1. Cf. Holte v. State, 467 N.W.2d 346, 349 (Minn. Ct. App. 1991) (affirmative

---

[2]The trial court in Williams also concluded that jurisdiction was barred by a provision of CERCLA that precludes jurisdiction over challenges to administrative clean-up orders, 42 U.S.C. § 9613(h). 597 N.W.2d at 343; see also Werlein v. United States, 746 F. Supp. 887, 894, 897 (D. Minn. 1990) (no jurisdiction over MERA claims regarding site subject to ongoing administrative clean-up), vacated in part on other grounds, 793 F. Supp. 898 (D. Minn. 1992). The Minnesota Court of Appeals concluded that § 9613(h) did not bar jurisdiction over state court proceedings based on state law. Williams, 597 N.W.2d at 344. The court's conclusion was bolstered by the fact that § 9613(h) specifically excludes from its jurisdictional bar federal suits alleging state claims in which jurisdiction is predicated on diversity of citizenship. Id. Viacom removed this case to federal court on the ground of diversity of citizenship.

order of Department of Agriculture pursuant to Grasshopper Control Act was not amenable to MERA challenge). Requiring a direct conflict with agency action to find preemption takes cognizance of both the language in section 116B.03, subd. 1, protecting administrative action from MERA challenge, and the language of Minn. Stat. § 116B.12, which provides that the "rights and remedies provided [in MERA] shall be in addition to any administrative, regulatory, statutory or common law rights and remedies now or hereafter available." See State by Fort Snelling State Park Ass'n v. Minneapolis Park & Rec. Bd., 673 N.W.2d 169, 177 (Minn. Ct. App. 2003) (citing § 116B.12 in declining to find that MERA claim was preempted by administrative proceedings).

Because Viacom and the Minnesota Pollution Control Agency have, as yet, not agreed upon substantive terms of remediation, there is as yet no conflict between any order of the Minnesota Pollution Control Agency and the district court's order. Whether any conflict would ever arise is completely speculative, and we cannot find preemption based on hypothetical facts.

Viacom contends that the administrative stipulation rendered moot the MERA claim. We must consider whether a defendant's entry into an agreement with a third party to negotiate a resolution to the violation on which injunctive relief is based moots a claim for injunctive relief. "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)). The "heavy" burden of proving mootness falls on the party asserting the case has become moot. Id. A case becomes moot if it can be said with assurance that there is no reasonable expectation that the violation will recur or if interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. Id.

Viacom contends that by entering the administrative consent order, it responded to the continuing contamination of the soil and groundwater at the site. But, as the district court found, Viacom did not abate the contamination. Whether abatement ever occurs depends on future events entirely outside Kennedy's control. As the Supreme Court pointed out in Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc., 528 U.S. 167, 191-92 (2000), the question of mootness, unlike that of standing, is likely to be raised after years of litigation when the case is far advanced. Because of that societal investment in the case, "to abandon the case at an advanced stage may prove more wasteful than frugal." Id. at 192. If the suit were to be dismissed upon an agreement between third parties to perform at some time in the future, if "some impediment arises or some prolonged delay ensues" in the planned performance, the plaintiff would be "at square one." Kostok v. Thomas, 105 F.3d 65, 66 (2d Cir. 1997). In this case, Kennedy is not a party to the unperformed administrative consent agreement. If the Agency fails to devote the resources to see that Viacom eventually performs, Viacom does not suggest that Kennedy can enforce the agreement.

Viacom cites Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc., 138 F.3d 351 (8th Cir. 1998), in which an action to enjoin a contractor from violating a pollution discharge permit was dismissed as moot after the construction project which was causing the violations was completed and the permit had terminated. It also cites Grandson v. Univ. of Minnesota, 272 F.3d 568, 574 (8th Cir. 2001), cert. denied, 535 U.S. 1054 (2002), in which a claim seeking an injunction requiring the University to establish a women's hockey team was deemed moot because the University had already established such a team at the behest of the United States Department of Education. Additionally, Viacom cites Mississippi River Revival, Inc. v. City of Minneapolis, 319 F.3d 1013, 1015 (8th Cir. 2003), in which another Clean Water suit seeking to force defendants to obtain discharge permits was moot once the permits were obtained. Id. at 1016. Civil penalties under the Clean Water Act were not available for "wholly past violations" and the defendants were able to prove that it

was "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Id. (quoting Laidlaw, 528 U.S. at 189). The claim for civil penalties was therefore moot as well as the claim for injunctive and declaratory relief. In each case Viacom cites, the condition on which the suit was based had been remedied. Here, it has not.

Even assuming for the sake of argument that entering an administrative agreement to do something in the future is the same thing as having already done the thing for purposes of mootness analysis, in this particular case, the consent order does not contain substantive standards for remediation of the contamination. Relief granted in another tribunal can moot a claim, but only where the relief granted is complete. See Lewis v. BT Inv. Managers, Inc., 447 U.S. 27, 35 n.5 (1980); 13A Charles Alan Wright et al., Federal Practice and Procedure § 3533.2 & n.31 (1984 & 2003 Supp.) ("Partial relief in another action, on the other hand, does not moot an action seeking additional relief.").

The district court ordered Viacom to "remediate the site's soil, groundwater, and building interior so that the previously-placed deed restriction may be removed." Testimony at trial indicated that a deed restriction is required when the level of PCBs on the property exceeds the Minnesota Pollution Control Agency's reference value, which is 1.2 milligrams per kilogram. The site had PCB concentrations as high as 9,100 milligrams per kilogram. The consent order neither orders Viacom to abate the level of PCBs to any particular level or to make it possible to clear the title restriction. Therefore, the relief granted by the consent order is not the same as that granted by the MERA injunction. Viacom has not proven that the MERA injunction is moot.

However, the injunction is subject to another serious objection. We conclude that MERA does not support the injunction as drawn, even without regard to the effect of the administrative consent order. Viacom contends that the private attorney

general-type suit available under MERA is preventative in nature and does not authorize the court to order clean-up of an existing toxic waste site.

MERA provides that any partnership, corporation, association, organization or other entity with members residing in Minnesota may bring a civil action for declaratory or equitable relief in the name of the state of Minnesota "for the protection of the air, water, land, or other natural resources located within the state . . . from pollution, impairment, or destruction." Minn. Stat. § 116B.03, subd. 1. "Pollution, impairment or destruction," is defined as "any conduct by any person" which violates, or is likely to violate a state standard, permit, etc. or which "materially adversely affects or is likely to materially adversely affect the environment." Minn. Stat. § 116B.02, subd. 5. Viacom cites Werlein v. United States, 746 F. Supp. 887, 898 (D. Minn. 1990), vacated in part on other grounds, 793 F. Supp. 898 (D. Minn. 1992), in which the court observed: "Generally, MERA does not seem to contemplate affirmative injunctive relief that essentially amounts to an order to clean up past pollution. . . . In fact, If MERA were so construed, courts could use MERA to order clean-up of all pollution anywhere within the state. Under plaintiffs' definition, whoever is responsible for that pollution is engaging in conduct by not cleaning it up."

The language Viacom quotes from Werlein was followed by a caveat that Viacom omits, interpreting MERA to authorize injunctive relief to clean up hazardous substances when such substances create ongoing pollution of underground water and lakes, which constitute "separate natural resources." 746 F. Supp. at 898.

> Even under the view that MERA only protects the land, air and water from current or prospective harm, the statute applies, because both are present here. While MERA may not authorize the Court to order a total cleanup at the Trio Solvents site, the Court believes that MERA empowers it to order defendants to abate any continuing contamination of underground or surface waters.

Id.; accord Soo Line R.R. v. B.J. Carney & Co., 797 F. Supp. 1472, 1486-87 (D. Minn. 1992) ("[T]he failure to remedy a toxic waste site is considered ongoing actionable conduct under MERA. . . . Because the complaint alleges that the defendants' activities have caused hazardous substances to be released that will continue to contaminate the soil and groundwater at the site, the Court finds that Soo Line has properly pleaded a claim under MERA." (citation omitted)). These cases from the District of Minnesota appear to us to have arrived at the correct interpretation of MERA, which is that the statute can require remediation of past pollution to the extent past deposits pose a threat of continuing contamination of natural resources, including soil and water.

Viacom stipulated in the administrative consent order that "there . . . continue to be releases or threatened releases, within the meaning of Minn. Stat. § 115B.02, subd. 15, of these hazardous substances from the Kennedy Building Site. . . ." At trial, Kennedy's expert William Welbes testified that the PCBs on the Kennedy site continued to migrate because they were accompanying non-PCB transformer oil, which would migrate with the groundwater. Welbes also testified that the chlorobenzenes on the site would also migrate. The district court found: "The PCBs continue to migrate in the soil and groundwater today due to the presence of transformer mineral oil constituents."

The district court's Conclusions of Law pertaining to Kennedy's MERA claim state in their entirety:

> [Kennedy] claims that Viacom is liable pursuant to the Minnesota Environmental Rights Act, Minn. Stat. §§ 116B.01 et seq. The Court concludes that [Kennedy] has proven its MERA claim by the preponderance of the evidence.
> Accordingly, the Court grants judgment in favor of [Kennedy] and against Viacom, and affirmatively enjoins Viacom to remediate the site's soil, groundwater, and building interior so that the previously-placed deed restriction may be removed, pursuant to Minn. Stat. § 116B.07.

-22-

The order in this case exceeds the relief authorized by MERA. The district court's injunction is not aimed at prevention of new pollution of separate natural resources, but orders complete clean-up of the Kennedy site, sufficient to clear the deed restriction, without any reference to what would be necessary to prevent future pollution. Testimony at trial indicated that a deed restriction is required when the level of PCBs on the property exceeds the Minnesota Pollution Control Agency reference value, which is 1.2 milligrams per kilogram. A PCB level of more than 1.2 milligrams per kilogram does not necessarily mean that the contamination threatens neighboring land or water. Kennedy's expert Welbes testified at trial, "Cleanup is not necessarily required [when the PCB levels exceed 1.2] as long as it can be proven that it does not pose an immediate health risk and that the plume is stable." Jan. 30, 2002, vol. 2, p. 166. Although there is evidence of continuing migration of the contaminants, the injunction is not tailored to address only that problem. Therefore, the injunction cannot be upheld as drawn. The injunction must be redrawn to order only the relief authorized by MERA, that is, the prevention of ongoing releases of PCBs and chlorobenzenes into soil and groundwater.

We must remand the injunction for more precise definition of the specific acts required of Viacom. See United States v. Articles of Drug, 825 F.2d 1238, 1247 (8th Cir. 1987).

III.

The district court awarded attorneys' fees, expert witness fees and costs authorized under MERLA, Minn. Stat. § 115B.14, in the amount of $1,113,915. Viacom contends that the fees and costs award included expenses incurred in litigating claims other than the MERLA and CERCLA claims, and that there is no statutory authorization for award of fees on those claims.

-23-

The district court's decision to award fees under MERLA to the prevailing party and the amount of such an award will not be disturbed absent a clear abuse of discretion. Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 939 (8th Cir. 1995); Musicland Group, Inc. v. Ceridian Corp., 508 N.W.2d 524, 535 (Minn. Ct. App. 1994). "A request for attorney's fees should not result in a second major litigation." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).

The starting point for determining the fee award is the number of hours reasonably expended on the case multiplied by a reasonable hourly rate. Musicland Group, 508 N.W.2d at 535. The magistrate judge to whom the district court referred the fees litigation conducted this analysis, and Viacom does not demonstrate an abuse of discretion with regard to this analysis.

Where a plaintiff succeeds on some claims in litigation and fails on others, the court must decide first, whether the claims involve a common core of facts and were based on related legal theories; and second, whether the plaintiff's level of success justifies basing the fee award on the hours reasonably expended. Id. (citing Hensley, 461 U.S. at 430). No fee can be awarded on unsuccessful claims that were not related to the successful claim. Hensley, 461 U.S. at 434-35. Where successful and unsuccessful claims involve a common core of facts and related theories, it will generally be impracticable to separate the hours spent on the claims, and rather than trying to do so, the court should focus on the overall relief the plaintiff obtained in relation to the time reasonably spent on the litigation. Id. at 435. In assessing whether claims are so related that the fees cannot practically be severed, one consideration is whether the "types of relief requested" under the various claims are similar or have differing purposes. Musicland, 508 N.W.2d at 535. Apportionment of fees between successful and unsuccessful claims is entrusted to the district court's discretion. Gopher Oil Co. v. Union Oil Co., 955 F.2d 519, 527 (8th Cir. 1992). Where the MERLA claim is accompanied by other claims for which no statutory fees are available, as in this case, the relationship between eligible and non-eligible claims

is subject to the same analysis as the relationship between successful and non-successful claims. See id. (successful common law fraud claim had different purpose than CERCLA and MERLA claims and therefore fees were not compensable); Musicland, 508 N.W. 2d at 535 (successful common law claims all intertwined with MERLA and therefore fees compensable).

The magistrate judge considered the intertwinement question and concluded that "all claims litigated shared a common core of facts with the MERLA claim rather than an ‹overriding, or separate and distinct' purpose. Consequently, attorneys fees and costs[s] are recoverable because [Kennedy] had a high degree of success. At trial [Viacom] was found 100% liable for clean-up, and [Kennedy] was 0% liable." The district court awarded fees in accordance with the magistrate's recommendation.

Viacom argues that the time spent on the MERA claim is not compensable and should be separated from the compensable fees because the MERA claim sought injunctive relief which was not available under MERLA. The MERLA claim resulted in a judgment for Kennedy's past response costs and a declaration that Viacom is "liable for all future response costs, pursuant to Minn. Stat. § 115B.11, subd. 2(b)." Damages were not available under MERA, Minn. Stat. § 116B.03, and the MERA injunction in this case directed Viacom to clean up the contamination, rather than reimbursing Kennedy for doing so. Viacom cites Gopher Oil, in which we remanded for separation of fees incurred in litigating a fraud claim, from those incurred in litigating a MERLA claim. 955 F.2d at 527. We held that the purpose of the fraud claim was to protect the plaintiff from contribution claims resulting from its ownership of the contaminated facility, and this "overriding" purpose mandated separation of the fees notwithstanding intertwinement of the claims. Id. Under the reasoning of Gopher Oil, the distinction in the aims and purposes of the MERLA claim and the MERA claim is sufficient to require the district court to separate out the fees incurred in furtherance of the MERA claim, to the extent practicable.

Viacom makes the same argument with regard to Kennedy's claim for punitive damages, but Kennedy's fee petition stated that it excluded from its fee request the hours spent solely in furtherance of its punitive damages claim, and Viacom does not attempt to demonstrate that this is incorrect.

Viacom also contends that it should not be liable for fees incurred after its settlement proposal of June 18, 2001. We reject the contention that the June 18 proposal can be given such an effect, for reasons discussed in section IV, below.

We must remand for the district court to reduce the fee award by the amount of fees attributable to the MERA claim.

IV.

On June 18, 2001, Viacom sent Kennedy an offer of settlement consisting of an eight-page proposed agreement under which Viacom would undertake clean-up operations "to the extent, and only to the extent, required by any governmental regulatory agency having the requisite authority and jurisdiction" and would also pay $400,000 to Kennedy. Under the proposal, if Viacom damaged the building during remediation, "Viacom shall . . . if appropriate in the sole discretion of Viacom . . restore any impaired premises to substantially the same condition as existed immediately prior to the implementation of the investigation and remediation." (emphasis added). The agreement did not specify any substantive standards for remediation of the contamination and in fact contained the following prohibition:

> Prohibition. [Kennedy] shall not, directly, indirectly, or in any manner, seek to influence the actions or decisions of any governmental regulatory agency concerning the soil on the Property or groundwater beneath or adjacent to the Property, or the extent of Viacom's obligations with respect thereto. To the extent that [Kennedy] violates this prohibition, [Kennedy] shall be and become solely responsible for

-26-

the investigation and remediation of the soil on the Property and the groundwater beneath and adjacent to the Property.

This settlement proposal was made approximately six months before the Minnesota Pollution Control Agency consent order was executed. Thus, the purport of the proposal was for Viacom to do whatever unspecified action a government agency might later decide on, if any, with Kennedy barred from any input into the appropriate measures to be taken with regard to abatement of hazardous waste on its own property.

Viacom argues that this proposal stopped the accrual of prejudgment interest under Minn. Stat. § 549.09, subd. 1(b). The magistrate judge concluded that Viacom's offer to settle was "not sufficiently precise" to afford it the benefit of the offer-counter offer mechanism in the Minnesota statute. This apparently referred to the lack of substantive standards for the clean-up and indeed the contingency of the clean-up offer on Viacom being ordered to do anything at all by some government agency at some unspecified time. Additionally, the offer added a condition that Kennedy would not exercise its rights to petition the government agency in any way concerning government action affecting its own property. Viacom demanded that Kennedy agree to a condition that certainly has not been granted by the judgment in this case, nor could such a condition have been included as relief for any cause of action litigated herein. Viacom's proposal did not function as an offer of settlement within the meaning of Minn. Stat. Ann. § 549.09 stopping the accrual of interest. Cf. Hodder v. Goodyear Tire & Rubber Co., 426 N.W.2d 826, 841 (Minn. 1988) (offer that did not encompass all claims in suit did not stop interest).

Obviously, the award of interest on the strict liability award must be vacated, but the interest on the CERCLA and MERLA award should be affirmed.

## V.

We reverse the judgment in favor of Kennedy for strict liability and punitive damages, reverse and remand the award of injunctive relief with instructions to modify the injunction in accordance with this opinion, remand the award of attorneys' fees for segregation and disallowance of those hours expended in furtherance of the MERA claim, affirm so much of the interest award as pertains to the CERCLA and MERLA claims, and reverse that part of the interest award that pertains to the strict liability damages.  We remand for further proceedings consistent with this opinion.

_____